378 F.3d 1002
 NISSAN MOTOR CO., a Japanese corporation; Nissan North America, Inc., a California corporation, Plaintiffs-Appellees,
v.
NISSAN COMPUTER CORPORATION, a North Carolina corporation, Defendant-Appellant, and
The Internet Center Inc., a North Carolina corporation, Defendant.
Nissan Motor Co., a Japanese corporation; Nissan North America, Inc., a California corporation, Plaintiffs-Appellants,
v.
Nissan Computer Corporation, a North Carolina corporation, Defendant-Appellee, and
The Internet Center Inc., a North Carolina corporation, Defendant.
Nissan Motor Co., a Japanese corporation; Nissan North America, Inc., a California corporation, Plaintiffs-Appellees,
v.
Nissan Computer Corporation, a North Carolina corporation; The Internet Center Inc., a North Carolina corporation, Defendants-Appellants.
Nissan Motor Co., a Japanese corporation; Nissan North America, Inc., a California corporation, Plaintiffs-Appellants,
v.
Nissan Computer Corporation, a North Carolina corporation; The Internet Center Inc., a North Carolina corporation, Defendants-Appellees.
 No. 02-57148.
 No. 03-55236.
 No. 03-55017.
 No. 03-55144.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 7, 2004.
 Filed August 6, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Neil D. Greenstein, Techmark, San Jose, CA, for defendant-appellant and cross-appellee Nissan Computer Corporation.
 Bruce R. Fertel, Fertel & Associates, Beverly Hills, CA, and Joseph A. Hearst (argued), Berkeley, CA, for defendant-appellant and cross-appellee The Internet Center, Inc.
 Wayne M. Barsky and Julian W. Poon (argued), Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for plaintiffs-appellees and cross-appellants Nissan Motor Co., Ltd., and Nissan North America, Inc.
 Paul Alan Levy, Alan B. Morrison, and Allison M. Zieve, Public Citizen Litigation Group, Washington, DC, for amicus curiae Public Citizen.
 Appeals from the United States District Court for the Central District of California; Dean D. Pregerson, District Judge, Presiding. D.C. No. CV-99-12980-DDP.
 Before: TROTT, RYMER, and THOMAS, Circuit Judges.
 RYMER, Circuit Judge:
 
 
 1
 This appeal raises a number of trademark issues arising out of the use by Uzi Nissan of his last name for several business enterprises since 1980, his use beginning in 1991 of "Nissan" as part of the name of a North Carolina computer store he owned — Nissan Computer Corp. — and his registration in 1994 of "nissan.com" as a domain name and website for advertising various products including for a period in 1999, automobile-related products and services. Nissan Motor Co., Ltd., a Japanese automobile manufacturer that registered the mark "NISSAN" in 1959, and its subsidiary, Nissan North America, Inc., began using that name, rather than "DATSUN," to identify and market their vehicles in the United States in 1983. They filed this action in 1999 complaining that "nissan.com" diluted the NISSAN mark under the Federal Trademark Dilution Act (FTDA), 15 U.S.C. § 1125(c), as well as the California analogue, Cal. Bus. & Prof.Code § 14330, and infringed it under the Lanham Act, 15 U.S.C. § 1114.
 
 
 2
 In a series of summary judgment rulings, the district court held that Nissan Computer's automobile-related advertising constituted trademark infringement on the basis of initial interest confusion, but that non-automobile-related advertising did not. The court determined that Nissan Motor's dilution suit was not barred by laches, that Nissan Computer's first commercial use of "nissan" was in 1994 when it registered the website "nissan.com" because that was the only use identical to the NISSAN mark, that by then Nissan Motor's NISSAN mark had become famous, and that Nissan Computer's use of "nissan.com" dilutes the quality of Nissan Motor's mark. Accordingly, the court enjoined Nissan Computer (and its alter ego, The Internet Center Inc.) from posting any commercial content at nissan.com and from placing links to other websites that contain disparaging remarks or negative commentary about Nissan Motor.
 
 
 3
 Neither side is entirely happy and both appeal. On the main issues, we hold:
 
 
 4
 Initial interest confusion exists as a matter of law as to Nissan Computer's automobile-related use of "nissan.com" because use of the mark for automobiles captures the attention of consumers interested in Nissan vehicles. To this extent "nissan.com" trades on Nissan Motor's goodwill in the NISSAN mark and infringes it, but other uses do not because there is no possibility of confusion as to them.
 
 
 5
 Even though the NISSAN mark was distinctive and incontestable within five years of registration, it must also have become "famous" before Nissan Computer's first commercial use in order to be entitled to protection against dilution. The first use for purposes of the FTDA is that use which is arguably offending, here, "Nissan Computer," because any commercial use of a famous mark is diluting regardless of whether it is confusing or combined with other identifiers. As such a use occurred in 1991, and because the district court believed that triable issues of fact exist about fame of the NISSAN mark before 1994, summary judgment on the dilution claim cannot be sustained.
 
 
 6
 Finally, to enjoin Nissan Computer from providing visitors to nissan.com a link to sites with disparaging or negative commentary about Nissan Motor is a content-based restriction on non-commercial speech that is inconsistent with the First Amendment.
 
 
 7
 As a result of our conclusion on these and other issues, we affirm in part (on the infringement claim), reverse in part (on the dilution claim), and remand.
 
 
 8
 * It is uncontroverted that Nissan Motor Co. and its subsidiary Nissan North America, Inc. (collectively, Nissan Motor) have marketed and distributed automobiles in the United States since 1960. Nissan Motor registered the NISSAN mark for ships and vehicles on the Principal Register in 1959. Vehicles were sold in the United States under the name "Datsun" until 1983, when Nissan Motor began marketing its vehicles under the name "Nissan." For a while the two names were used together, but since 1985 only the "Nissan" name has been used.
 
 
 9
 Uzi Nissan used his last name for various businesses, including "Nissan Foreign Car Mobile Repair Service" (1980), an import/export business "Nissan International, Ltd." (1987), and "Nissan Computer Corp." established in 1991 to engage in the business of computer sales and services. On June 4, 1994, Nissan Computer registered the domain name nissan.com and established a website at that address to advertise its computer-related goods and services. In July 1995 Nissan Motor sent Nissan Computer a letter expressing "great concern" about use of the word "Nissan" in Nissan Computer's domain name; Nissan Computer made no response and nothing further happened until Nissan Motor contacted Uzi Nissan in October 1999.
 
 
 10
 Meanwhile, Nissan Computer registered "nissan.net" to offer services as an Internet Service Provider in 1996. In August 1999, it altered the nissan.com website by adding a new logo with the name "nissan.com," sold space for advertising, and registered with a website for banner advertising. Nissan Computer received a payment for each time a user clicked through to an advertiser's website. The first links (in August and September) were for goto.com, Barnes & Noble, CNet.com, and Netradio.com. Automobile-related ads appeared in late September. Within several weeks Nissan Computer signed up cartrackers.com, priceline.com, tunes.com, askjeeves.com, directhit.com, safari.com, lycos.com, asimba.com, ameritech.com, and about.com; by December, 1stopauto.com, hotlinks.com, shabang.com, fastweb.com, remarq.com, carprices.com and stoneage.com had been added.
 
 
 11
 In October 1999, Nissan Motor told Uzi Nissan that it wished to purchase nissan.com, but negotiations came to naught. This action was filed against Nissan Computer on December 10, 1999. The complaint asserts claims for trademark dilution in violation of federal and state law; trademark infringement; domain name piracy; false designation of origin; and unfair competition. Nissan Motor moved for a preliminary injunction, which the district court granted in a published opinion, Nissan Motor Co., Ltd. v. Nissan Computer Corp., 89 F.Supp.2d 1154 (C.D.Cal.2000), and which we affirmed. The injunction ordered Nissan Computer to post prominent captions on the first web page of the nissan.com and nissan.net websites identifying them as affiliated with Nissan Computer Corporation and disclaiming affiliation with Nissan Motor, and to refrain from displaying automobile-related information, advertisements, and links.
 
 
 12
 In March 2000, Nissan Computer posted a link on nissan.com and nissan.net that stated "Nissan Motor's Lawsuit Against Nissan Computer." Clicking this link transferred the user to ncchelp.org. A banner at ncchelp.org stated "We Are Being Sued!!!"; and included links entitled (1) "story," which contained Uzi Nissan's description of this litigation, (2) "FAQ," (3) "news," which contained links to media reports, (4) "people's opinions," which contained emails received by Uzi Nissan, and (5) "how you can help," which contained links via banner advertising, including a link to a site operated by The Internet Center (TIC), which had auto-related advertising. TIC was owned and operated by Uzi Nissan, and was added as a defendant in Nissan Motor's First Amended Complaint.
 
 
 13
 The district court resolved the action on cross-motions for summary judgment. In summary, the court held that TIC was an alter ego of Nissan Computer and that both TIC and Nissan Computer are liable for trademark infringement on account of their use of the NISSAN mark for automobile-related links and for dilution. The court inferred from Nissan Computer's altering the website in August 1999 to display auto-related advertising that it intended to confuse consumers. The court granted Nissan Computer's motion for summary judgment on non-automobile-related use of the website.
 
 
 14
 On the dilution claim, the court declined to bar Nissan Motor's suit on account of laches because the internet was an emerging technology and Nissan Computer was not prejudiced by delay. The court initially found that the fame of the NISSAN mark was to be measured as of 1991, when Nissan Computer was incorporated, and that there was a question of material fact whether the NISSAN mark was famous as of that date. However, in a later ruling that granted judgment to Nissan Motor, the court determined fame as of 1994 when Nissan Computer first used the NISSAN mark alone because that is the use that Nissan Motor disputes, and as of 1999 when TIC did. Applying the fame factors set out in the FTDA, 15 U.S.C. § 1125(c), the court concluded that the NISSAN mark was famous at the time that Nissan Computer registered the "nissan.com" domain name in 1994. It held that Nissan Computer's use of the NISSAN mark diluted the quality of that mark by blurring its ability to distinguish Nissan Motor's goods from other companies' products and by tarnishing it because the look and design of the nissan.com website falls short of the high standards that Nissan Motor sets for itself, and because the site posts disparaging remarks about Nissan Motor and this lawsuit. Accordingly, the court concluded that Nissan Motor is entitled to an injunction that prohibits commercial content at the nissan.com and nissan.net sites. Although it declined to preclude Uzi Nissan from using the site for personal purposes, the court decided that disparaging remarks and negative commentary posted on the sites or through links are sufficiently commercial to bring use of the domain names within the scope of the FTDA because critical commentary at those sites, where the domain name is the mark, exploits the goodwill of Nissan Motor in the NISSAN mark. Therefore, the court permanently enjoined Nissan Computer and TIC from posting commercial content, advertising, and disparaging remarks or negative commentary regarding Nissan Motor on nissan.com or nissan.net; and placing links to other websites containing commercial content or disparaging remarks and negative commentary about Nissan Motor. 231 F.Supp.2d 977, 981 (C.D.Cal.2002). The district court subsequently denied Nissan Computer's request for a stay, explaining that it is the coupling of disparaging remarks with visitors' expectations of finding Nissan Motor that makes the enjoined conduct commercial and that the First Amendment is not implicated because the domain names are source identifiers and not part of the communicative message. We denied a request for a stay as well.
 
 
 15
 These cross-appeals followed. Nissan Computer and TIC appeal the judgment in Nissan Motor's favor on laches, dilution, retroactivity of the FTDA, alter ego, and infringement as to automobile-related use of nissan.com. Nissan Computer appeals the permanent injunction; Nissan Motor cross-appeals, asking that the injunction be broadened to include transfer of the domain names nissan.com and nissan.net to itself in exchange for the fair value of Nissan Computer's investment.[1]
 
 II
 
 16
 We start with the dilution claim because this is where the parties focus most of their attention.
 
 
 17
 Four preliminary issues can be summarily resolved. First, the parties disagree about the relevant statute of limitations and whether Nissan Motor's delay in bringing this action presumptively constituted laches. We need not address their arguments, however, because regardless, the district court did not abuse its discretion in finding that Nissan Computer was not prejudiced. See Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 839 (9th Cir.2002) (stating that laches will not apply unless the defendant will suffer prejudice from delay if the suit were to proceed).
 
 
 18
 Second, Nissan Computer argues that the FTDA should not be applied retroactively because by the time it was passed in 1996, Uzi Nissan had been using "Nissan" for 16 years, Nissan Computer had been using it for nearly five years, and nissan.com had been up and running for 18 months. However, application of the FTDA is not retroactive because it only authorizes prospective relief. Landgraf v. USI Film Products, 511 U.S. 244, 273, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Three circuits have so held, and we join them. See Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 669-70 n. 11 (5th Cir.2000); Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 502(2d Cir.2000); Viacom Inc. v. Ingram Enters., Inc., 141 F.3d 886, 889-90 (8th Cir.1998).
 
 
 19
 Third, Nissan Computer argues that the district court violated due process by changing the date for determining fame of the NISSAN mark from 1991 — which it had used in denying partial summary judgment in 2001 — to 1994, which it used in its final order granting summary judgment. However, the issue had been fully briefed and final judgment had not been entered. The court had discretion to see things differently without affronting due process.
 
 
 20
 Finally, TIC contends that it is not an alter ego of Nissan Computer just because they are related companies, share resources, and exchange interest-free loans. The district court considered the appropriate factors, see UA Local 343 v. NorCal Plumbing, Inc., 48 F.3d 1465, 1475-76 (9th Cir.1995), and correctly concluded that the separate identity of each was not respected, and that sufficient injustice could occur to Nissan Motor from TIC's misuse of the corporate form to permit Nissan Computer to capitalize on the NISSAN mark while rendering itself judgment proof.
 
 
 21
 * "[I]njunctive relief is available under the Federal Trademark Dilution Act if a plaintiff can establish that (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous;" Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 873-74 (9th Cir.1999), and there is actual harm to the trademark holder, Moseley v. v. Secret Catalogue, Inc., 537 U.S. 418, 433-34, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). Noncommercial use of a mark is excepted. See 15 U.S.C. § 1125(c)(4)(B).
 
 
 22
 The FTDA's "grandfathering" clause lies at the heart of this dispute. It provides:
 
 
 23
 The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.
 
 
 24
 15 U.S.C. § 1125(c)(1).
 
 
 25
 In Nissan Computer's view, the "first use" principle requires that fame be measured as of the defendant's actual first use of the mark, not the use that the plaintiff finds objectionable. This would be no later than 1991, when Nissan Computer was incorporated and used the name to sell computers.[2] Not surprisingly, Nissan Motor has a different view, that the date to determine famousness of its NISSAN mark is the first time that Nissan Computer used "nissan" by itself as a trade or company name instead of as a composite trade or company name. This would be 1994, when Nissan Computer registered nissan.com as a domain name and opened a website for advertising. Nissan Motor points out that the text of the statute refers to "such use," which Nissan Motor interprets to mean not just any use — but the "commercial use in commerce of a mark."[3] Drawing on the anti-dissection rule from trademark infringement law, Nissan Motor also posits that use of "Nissan" by itself is a different "commercial use in commerce" of the NISSAN mark than is "Nissan Computer Corp."
 
 
 26
 We believe "such use" for purposes of § 1125(c) is a use that, assuming it occurs after another's mark has become famous, would arguably dilute the mark. This follows from the text of the statute as well as its purpose. The FTDA protects the holder of a trademark from dilution, which is different from, and broader than, infringement in that neither confusion nor competition is required and the protection is nationwide in scope. See Avery, 189 F.3d at 873. Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of — (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. As the Supreme Court explained, the purpose of the FTDA "is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it, even in the absence of a likelihood of confusion." Moseley, 537 U.S. at 431, 123 S.Ct. 1115 (quoting H.R.Rep. No. 104-374, p. 2 (1995), U.S.Code Cong. & Admin.News 1995, pp 1029, 1030). "Dilution refers to the whittling away of the value of a trademark when it's used to identify different products." Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 903 (9th Cir.2002) (citation and quotation marks omitted). Because protection from dilution comes close to being a "right [ ] in gross," it is a cause of action "reserved for a select class of marks — those marks with such powerful consumer associations that even non-competing uses can impinge on their value." Avery Dennison, 189 F.3d at 875. For this reason, the FTDA extends dilution protection only to those whose mark is a "household name." Thane Int'l., Inc. v. Trek Bicycle Corp., 305 F.3d 894, 911 (9th Cir.2002).
 
 
 27
 "[T]he mark used by the alleged diluter must be identical, or nearly identical, to the protected mark" for a dilution claim to succeed. Id. at 905. This means that the mark itself must be identical, or nearly identical, not that it cannot be used in combination with some other identifier. For example, as the Report of the Subcommittee on Courts and Intellectual Property of the House Judiciary Committee observes of the FTDA, "the use of DUPONT shoes, BUICK aspirin, and KODAK pianos would be actionable under this legislation." See Moseley, 537 U.S. at 431, 123 S.Ct. 1115 (citing H.R.Rep. No 104-374, p. 3 (1995), U.S.Code Cong. & Admin. News 1995, pp 1029, 1030); Thane, 305 F.3d at 906, 910-11(citing the same examples in the Senate Report, S.Rep. No. 100-515, at 7 (1988), reprinted in 1988 U.S.C.C.A.N. 5577, 5583). We conjured others in Mattel, "[f]or example, Tylenol snowboards, Netscape sex shops and Harry Potter dry cleaners would all weaken the commercial magnetism of these marks and diminish their ability to evoke their original associations. These uses dilute the selling power of these trademarks by blurring their uniqueness and singularity, and/or by tarnishing them with negative associations." 296 F.3d at 903(internal quotations and citations omitted).
 
 
 28
 The point of dilution law is to protect the owner's investment in his mark. See, e.g., Thane, 305 F.3d at 904. This is why it is actionable for a store to call itself KODAK Pianos, as well as KODAK. As the use of KODAK pianos would dilute KODAK, then NISSAN pianos would dilute NISSAN if the NISSAN mark were as famous as KODAK. It follows that NISSAN Computers is a use that arguably dilutes the NISSAN mark. Whether it does in fact, of course, depends upon whether the capacity of the NISSAN mark to identify and distinguish goods or services sold by Nissan Motor has been lessened; however, for purposes of settling the date by which fame must be measured, Nissan Computer's use of the NISSAN mark is arguably diluting even though the word "Nissan" is used in combination with another identifier. See Mattel, 296 F.3d at 903-04(holding that "Barbie Girl" diluted Mattel's "Barbie" mark); see also Moseley, 537 U.S. at 433-34, 123 S.Ct. 1115 (suggesting that the evidence required to prove dilution may differ depending upon whether the junior and senior marks are identical). In sum, just as the TYLENOL mark, the BARBIE mark, and the KODAK mark are used in commerce when "snowboards," "Girl," and "pianos" are added, the NISSAN mark is used in commerce when other words are added to it such that if NISSAN were a famous mark, then "NISSAN Computer" could be a dilutive commercial use.
 
 
 29
 The Federal Circuit recently considered, and rejected, a statutory argument similar to Nissan Motor's, and to the view taken by the district court, that the use that matters for purposes of § 1125(c) is the first use that the trademark holder finds objectionable. In Enterprise Rent-A-Car Co. v. Advantage Rent-A-Car, Inc., 330 F.3d 1333, 1336 (Fed.Cir.2003), Enterprise challenged Advantage's use of the phrase "We'll Even Pick You Up" in television commercials broadcast in San Antonio, Texas between 1992 and 1995 as diluting its own phrases "Pick the Company that Picks You Up" and "Pick Enterprise, We'll Pick You Up," which Enterprise began using in 1994. Enterprise contended that prior use by Advantage in a limited geographic area did not bar its claim of dilution. The court recognized that the term "such use" in § 1125(c) "could refer to any use by the defendant in commerce," or "could refer to the particular use being challenged in the litigation." Id. at 1341. It held that the latter was "not a tenable reading of the statute," and that "the statute's reference to `such use' must refer to any use in commerce." Id. at 1341-42. We agree that this is a more sensible construction. As the Federal Circuit explained, "it is significant that there is no qualification in the statute requiring that the defendant's prior use be substantial or cover a wide geographic area to defeat an injunction under the statute." Id. at 1342. If it were otherwise, and first use for purposes of § 1125(c) turned on whatever use the mark's owner finds particularly objectionable, "[o]wners of famous marks would have the authority to decide when an allegedly diluting use was objectionable, regardless of when the party accused of diluting first began to use the mark." The Network Network v. CBS Inc., 54 U.S.P.Q.2d 1150, 1153 (C.D.Cal.2000).
 
 
 30
 Nissan Motor's reliance on the anti-dissection rule is also unhelpful. That doctrine prescribes that "a composite mark is tested for its validity and distinctiveness by looking at it as a whole, rather than dissecting it into its component parts." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:27 (4th ed.2003); GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir.2000) ("[I]t is the mark in its entirety that must be considered — not simply individual elements of that mark.") (citation omitted). However, our task here is not to test distinctiveness but to determine famousness.
 
 
 31
 Accordingly, we hold that any commercial use of a famous mark in commerce is arguably a diluting use that fixes the time by which famousness is to be measured. In this respect as in others, a dilution claim differs from a claim for infringement, because not all uses of a mark are actionable. See Interstellar Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 943-44 (9th Cir.2002) (explaining why companies using the same mark for different products with different consumer expectations may not cause initial interest confusion). For purposes of the FTDA, however, the commercial use of "Nissan" for computers in Nissan Computer was a use of the NISSAN mark in commerce that was arguably diluting. "Such use" occurred in 1991. Therefore, fame of the NISSAN mark must be measured as of 1991.
 
 B
 
 32
 Nissan Motor argues that even if the fame of its mark must be measured as of 1991 rather than 1994, reversal is not required because the NISSAN mark was also famous as of 1991. However, the district court found that there were triable issues of fact when it was of the view that fame should be determined as of 1991. The record is not so clear that we can affirm notwithstanding the district court's conclusion.
 
 
 33
 The FTDA lists eight non-exclusive factors for a court to consider in determining whether a mark is distinctive and famous. They are:
 
 
 34
 (A) the degree of inherent or acquired distinctiveness of the mark;
 
 
 35
 (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
 
 
 36
 (C) the duration and extent of advertising and publicity of the mark;
 
 
 37
 (D) the geographical extent of the trading area in which the mark is used;
 
 
 38
 (E) the channels of trade for the goods or services with which the mark is used;
 
 
 39
 (F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;
 
 
 40
 (G) the nature and extent of use of the same or similar marks by third parties; and
 
 
 41
 (H) whether the mark was registered ... or on the principal register.
 
 
 42
 15 U.S.C. § 1125(c)(1).
 
 
 43
 Without going into detail because we must remand in any event, there is no question that the NISSAN mark is distinctive because it became incontestable five years after being registered, yet "to be capable of being diluted, a mark must have a degree of distinctiveness and `strength' beyond that needed to serve as a trademark." Avery Dennison, 189 F.3d at 876 (citations and quotations omitted) (emphasis added). "[F]amousness requires more than mere distinctiveness." Id. at 879.
 
 
 44
 Nissan Motor introduced evidence through surveys, studies, and expert opinion that the NISSAN mark had considerable public recognition, however Nissan Computer questioned their methodology and import, and we have no ruling on these issues from the district court. For example, an Allison-Fisher survey found that NISSAN enjoyed 55% awareness among consumers in 1985, 60% in 1986, and 65% in 1991, but Nissan Computer's experts counter that the survey measured only the attitude of people who intended to buy a new car, thereby skewing the results in favor of Nissan Motor, and claim that there are methodological errors in the survey's analysis. The same applies to the Landor Research Survey, which concluded that Nissan Motor was one of the 200 most powerful brands in America in 1988; Nissan Computer's experts point out that the survey was a newspaper account without a description of methodology, universe of respondents, or statistical reliability of results. Another public opinion survey that reported consumer familiarity with "Nissan" was conducted between 1999 and January 2000 and spoke as of that time frame, which sheds no light on public perception in 1991. Although Nissan Motor's promotional expenditures for vehicles bearing the NISSAN mark — more than $898 million during the period 1985-1991 — weigh in its favor, we cannot say as a matter of law, on this record, that the survey, expert, and advertising evidence permit only the conclusion that the NISSAN mark was famous as of 1991.
 
 
 45
 The record is further clouded by what it shows about the word "Nissan" and its third-party use. "Nissan" is a common Jewish/Israeli last name, a Biblical term originally identifying the first month in the calendar, the contemporary name of the seventh month in the Jewish calendar, the Arabic word for April, and is part of the trademark or trade name of more than 190 unaffiliated businesses in the United States including "Nissan Thermos," "Nissan Chemical," and "Nissan Fire and Marine Insurance Company." The word "Nissan" is an acronym in Japanese for "Japanese Industries KK." Nissan Motor itself is a party to a Trademark Basic Agreement with "Nissan Chemical," "Nissan Agriculture and Forestry," "Nippon Oxygen Co.," "Nippon Fisheries Co.," and "Nippon Oil and Fat Co.," in which each agrees to cooperate to ensure the proper use and protection of the "Nissan" related trademark. And there are thousands of domain names that use the word "Nissan." All of this is relevant, because "when `a mark is in widespread use, it may not be famous for the goods or services of one business.'" Avery Dennison, 189 F.3d at 878 (quoting Trademark Review Commission, Report & Recommendation, 77 Trademark Rep. 375, 461 (Sept.-Oct.1987)). That other unaffiliated companies use "Nissan" in their names at a minimum raises a question whether the mark can be considered a famous mark eligible for dilution protection. See id. (stating that widespread use of the mark in the name of other companies makes fame unlikely).
 
 
 46
 In sum, we cannot say on this record that genuine issues of material fact do not exist as to the degree of distinctiveness of the NISSAN mark, the weight to be given and the conclusions to be drawn from the experts' reports and surveys, the impact of third party uses of NISSAN, and the overall fame of the NISSAN mark in 1991.
 
 C
 
 47
 After the district court's final decision in this case, the Supreme Court held in Moseley v. V Secret Catalogue, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003), that actual dilution must be shown for a dilution claim to succeed. Based on Moseley, Nissan Computer and TIC argue that summary judgment on the FTDA claim must be reversed because Nissan Motor presented no evidence of actual harm to the NISSAN mark. Nissan Motor argues otherwise, relying on Moseley's statement that "direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proved through circumstantial evidence — the obvious case is one where the junior and senior marks are identical." Id. at 434, 123 S.Ct. 1115. However, it is not entirely clear what the Court meant by this, see Ty Inc. v. Softbelly's Inc., 353 F.3d 528, 536 (7th Cir.2003), and appellate review would be aided by a record developed in light of Moseley and the district court's analysis of it. Therefore, we follow the lead of Horphag Research Ltd. v. Pellegrini, 337 F.3d 1036, 1041 (9th Cir.2003), and remand to give the district court an opportunity to consider in the first instance whether there has been actual dilution within the meaning of Moseley.
 
 
 48
 Nissan Motor also urges that remand is not necessary because the California analogue of the FTDA, Cal. Bus. & Prof.Code § 14330,[4] affords another basis upon which to affirm. However, the district court granted injunctive relief entirely under the FTDA. We prefer to hear from the district court in the first instance on this as well. The California analogue has generally been construed consistently with federal law, and no argument has been made to us about whether, or how, Moseley might affect what the California Supreme Court would do. In addition, Nissan Computer has claimed on appeal that a nationwide injunction for violation of state law is inappropriate and unconstitutional. See, e.g., Enterprise, 330 F.3d at 1342("A federal dilution statute is necessary because famous marks ordinarily are used on a nationwide basis and dilution protection is currently only available on a patch-quilt system of protection.... Further, court decisions have been inconsistent and some courts are reluctant to grant nationwide injunctions for violation of state law.... This simply encourages forum-shopping and increases the amount of litigation.") (quoting H.R.Rep. No. 104-374, at 3-4). While "California courts have repeatedly held that they have authority to issue injunctions which have effect beyond the borders of California," Duncan v. Stuetzle, 76 F.3d 1480, 1488-89 (9th Cir.1996), this remains an open question in this circuit. Id. at 1489 n. 13. As we have no ruling before us, we leave the constitutionality of a nationwide injunction based on state law for another day and remand to the district court to consider, if necessary, whether it would grant injunctive relief, or alter its scope, if the dilution liability were based solely on California law.
 
 D
 
 49
 Nissan Computer seeks relief from the provision of the permanent injunction that restrains it from placing links on nissan.com and nissan.net to other websites containing disparaging remarks or negative commentary about Nissan Motor. It contends that such speech is non-commercial, thus not diluting under the FTDA. Nissan Computer also maintains that the disclaimer ordered in the preliminary injunction is sufficient to assure there is no dilution. Finally, it submits that the injunction does not control the uses of the domain names but instead, prohibits a particular type of content posted at the website.
 
 
 50
 Nissan Motor argues that we need not revisit Nissan Computer's First Amendment challenge to the permanent injunction because we already considered and rejected it by denying Nissan Computer's motion to stay. We disagree, as the standards for a stay differ from the review on the merits that is now before us.[5] Beyond this, Nissan Motor defends the injunction as narrowly tailored, arguing that it restricts use of just two websites identical to the NISSAN mark. These restrictions, in its view, constitute regulation of nothing more than non-expressive trademark-equivalent domain names that do not express or communicate any views at all. For this reason, Nissan Motor asks us to hold that the First Amendment is not implicated because it is only when a trademark is used as part of a communicative message and not as a source identifier (which is what a domain name functions as in cyberspace) that the First Amendment is implicated. We disagree with this as well.
 
 
 51
 Prohibiting Nissan Computer from placing links to other sites with disparaging commentary goes beyond control of the Nissan name as a source identifier. The injunction does not enjoin use of nissan.com, but enjoins certain content on the nissan.com website. Thus, it is not the source identifier that is controlled, but the communicative message that is constrained. Consequently, the First Amendment is implicated.
 
 
 52
 The prohibited use of the mark is a content-based restriction because the purpose behind it is to control the message and it is not "justified without reference to the content of the regulated speech." See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citation and quotation omitted). "Content-based regulations pass constitutional muster only if they are the least restrictive means to further a compelling interest." S.O.C., Inc. v. County of Clark, 152 F.3d 1136, 1145 (9th Cir.1998) (citing Sable Communications of Cal. v. F.C.C., 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). As a content-based restriction, the injunction is presumptively invalid, see R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and not subject to a "time, place, and manner" analysis, see Reno v. ACLU, 521 U.S. 844, 879, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Thus, it is immaterial whether there are alternative places on the web that negative commentary about Nissan Motor can be posted. The injunction is also viewpoint based because it only prohibits disparaging remarks and negative commentary. See R.A.V., 505 U.S. at 391, 112 S.Ct. 2538.
 
 
 53
 The FTDA anticipates the constitutional problem where the speech is not commercial but is potentially dilutive by including an exception for noncommercial use of a mark. See 15 U.S.C. § 1125(c)(4)(B); Mattel, 296 F.3d at 905-06 (recognizing that the "noncommercial use" exemption in the FTDA was designed to prevent courts from issuing injunctions that collide with the First Amendment). So, the relevant question is whether linking to sites that contain disparaging comments about Nissan Motor on the nissan.com website is commercial.
 
 
 54
 "Although the boundary between commercial and non-commercial speech has yet to be clearly delineated, the core notion of commercial speech is that it does no more than propose a commercial transaction." Mattel, 296 F.3d at 906 (quoting Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1184 (9th Cir.2001)) (quotation marks omitted). "If speech is not `purely commercial' — that is, if it does more than propose a commercial transaction — then it is entitled to full First Amendment protection." Id. Negative commentary about Nissan Motor does more than propose a commercial transaction and is, therefore, non-commercial.
 
 
 55
 Nissan Motor argues that disparaging remarks or links to websites with disparaging remarks at nissan.com is commercial because the comments have an effect on its own commerce. See Jews for Jesus v. Brodsky, 993 F.Supp. 282, 308 (D.N.J.1998) ("The conduct of the Defendant also constitutes a commercial use of the Mark and the Name of the Plaintiff Organization because it is designed to harm the Plaintiff Organization commercially by disparaging it and preventing the Plaintiff Organization from exploiting the Mark and the Name of the Plaintiff Organization."). However, we have never adopted an "effect on commerce" test to determine whether speech is commercial and decline to do so here.
 
 
 56
 We are persuaded by the Fourth Circuit's reasoning in a similar case involving negative material about Skippy Peanut Butter posted on skippy.com, a website hosted by the owner of the trademark SKIPPY for a cartoon comic strip. CPC, which makes Skippy Peanut Butter, successfully sought an injunction that ordered removal of the material. The court of appeals reversed. CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 461-63 (4th Cir.2000). Recognizing that criticism was vexing to CPC, the court emphasized how important it is that "trademarks not be `transformed from rights against unfair competition to rights to control language.'" Id. at 462(quoting Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1710-11 (1999)). It held that speech critical of CPC was informational, not commercial speech. Likewise here, links to negative commentary about Nissan Motor, and about this litigation, reflect a point of view that we believe is protected.
 
 
 57
 Nissan Motor relies on San Francisco Arts & Athletics, Inc. v. USOC, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), to argue that it has obtained a limited property right in the NISSAN mark which Nissan Computer does not have a First Amendment right to appropriate to itself. In that case, the Court held that the Amateur Sports Act of 1978 did not unconstitutionally prohibit certain commercial and promotional uses of the word "Olympic" because Congress has a broader public interest than in traditional trademark law — promoting the "physical and moral qualities which are the basis of sport" and "the participation of amateur athletes from the United States in `the great four-yearly sport festival, the Olympic Games.'" Id. at 537, 107 S.Ct. 2971(quoting Olympic Charter, Rule 1 (1985)). For this reason the application of the Act to commercial speech was not broader than necessary to protect the legitimate congressional interest and therefore did not violate the First Amendment. But the Olympics are different, and there is no similar legislative interest at stake in this case.
 
 
 58
 Therefore, we conclude that the permanent injunction violates the First Amendment to the extent that it enjoins the placing of links on nissan.com to sites with disparaging comments about Nissan Motor.
 
 III
 
 59
 Nissan Computer argues that it did not infringe the NISSAN mark because it did nothing to draw potential Nissan Motor customers to its website or to divert customers who were looking for Nissan vehicles, and that there is at least a factual dispute whether Nissan Computer "captured" the initial interest of internet users looking for Nissan Motor products. Nissan Computer reasons that it did not offer automobiles or automobile-related services, rather it posted advertisements on its website much as a newspaper does. Nissan Motor responds that we already concluded that Nissan Computer altered its website to capitalize on the initial interest confusion of consumers who were looking for Nissan Motor's products when we affirmed the preliminary injunction entered in this case. We agree with Nissan Motor's position, but not for this reason. A determination that the district court did not abuse its discretion in granting preliminary relief is not binding on appeal from a final judgment. See, e.g., Rodde v. Bonta, 357 F.3d 988, 995 (9th Cir.2004). Nissan Motor also submits that the district court should have found trademark infringement based on Nissan Computer's non-automobile-related advertising given consumer expectations, identicalness of the internet domain names and its MARK, and the simultaneous use of the Web as a marketing channel by Nissan Computer and Nissan Motor. We disagree that reversal is indicated.
 
 
 60
 "The core element of trademark infringement is whether the similarity of the marks is likely to confuse customers about the source of the products.... Initial interest confusion occurs when the defendant uses the plaintiff's trademark `in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion.'" Interstellar, 304 F.3d at 941 (quoting Brookfield Communications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1062 (9th Cir.1999) (quoting Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1405 (9th Cir.1997) (internal quotation marks omitted))). As we hypothesized initial interest confusion in Brookfield, it would occur if Blockbuster Video put up a billboard that advertised West Coast Video at Exit 7, when in actuality West Coast was located at Exit 8, but Blockbuster was at Exit 7. Customers looking for West Coast would leave the freeway at Exit 7, but after not finding it, rent from Blockbuster rather than reentering the freeway in search of West Coast. Customers are not confused that they are renting from Blockbuster instead of West Coast, but Blockbuster misappropriates West Coast's acquired goodwill through the initial consumer confusion. See Brookfield, 174 F.3d at 1064.
 
 
 61
 "To evaluate the likelihood of confusion, including initial interest confusion, the so-called Sleekcraft factors provide non-exhaustive guidance." Interstellar, 304 F.3d at 942(citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 346(9th Cir.1979)). They are well known, and are: "(1) the similarity of the marks; (2) the relatedness or proximity of the two companies' products or services; (3) the strength of the registered mark; (4) the marketing channels used; (5) the degree of care likely to be exercised by the purchaser in selecting goods; (6) the accused infringers' intent in selecting its mark; (7) evidence of actual confusion; and (8) the likelihood of expansion in product lines. Sleekcraft, 599 F.2d at 346." Interstellar, 304 F.3d at 942. In the context of the internet, the three most important factors are the similarity of the marks, the relatedness of the goods or services, and the parties' simultaneous use of the internet in marketing. See id. (citing GoTo.com, 202 F.3d at 1205).
 
 
 62
 Nissan Computer's use of nissan.com to sell non-automobile-related goods does not infringe because Nissan is a last name, a month in the Hebrew and Arabic calendars, a name used by many companies, and "the goods offered by these two companies differ significantly." Id. at 944. However, Nissan Computer traded on the goodwill of Nissan Motor by offering links to automobile-related websites. Although Nissan Computer was not directly selling automobiles, it was offering information about automobiles and this capitalized on consumers' initial interest. An internet user interested in purchasing, or gaining information about Nissan automobiles would be likely to enter nissan.com. When the item on that website was computers, the auto-seeking consumer "would realize in one hot second that she was in the wrong place and either guess again or resort to a search engine to locate" Nissan Motor's site. Id. at 946. A consumer might initially be incorrect about the website, but Nissan Computer would not capitalize on the misdirected consumer. However, once nissan.com offered links to auto-related websites, then the auto-seeking consumer might logically be expected to follow those links to obtain information about automobiles. Nissan Computer financially benefitted because it received money for every click. Although nissan.com itself did not provide the information about automobiles, it provided direct links to such information. Due to the ease of clicking on a link, the required extra click does not rebut the conclusion that Nissan Computer traded on the goodwill of Nissan Motor's mark.
 
 
 63
 The marks are legally identical; the goods or services are related as to auto-related advertising, but not related as to anything else; and the parties simultaneously use the internet in marketing. The NISSAN mark is an incontestable mark, but it is also used in many channels of commerce, is a last name, and is a month. The degree of care exercised by a purchaser is disputable. Whereas a consumer purchasing an automobile will exercise great care, a consumer searching for information about automobiles on the internet may exercise little care and will click on all information about automobiles. The intent of Nissan Computer in selecting the mark weighs to some extent in favor of Nissan Computer because Uzi Nissan chose a domain name to correspond with his own name, but its intent in posting automobile-related links cuts the other way. There is evidence of actual confusion in that consumers have clicked on nissan.com to find out information about Nissan Motor. The likelihood of expansion in product lines can again cut both ways. Nissan Computer is unlikely to enter the automobile sales business, however, it is likely to advertise more auto-related products.
 
 
 64
 On balance we agree with the district court that Nissan Motor is entitled to summary judgment on trademark infringement as to automobile-related advertisements, and that Nissan Computer is entitled to summary judgment as to non-auto-related advertisements.
 
 IV
 
 65
 What we have already held largely disposes of Nissan Motor's cross-appeal asking that the injunction be broadened to require transfer of nissan.com and nissan.net. The district court declined to enter such an order and did not abuse its discretion in doing so. See Interstellar, 304 F.3d at 948(emphasizing discretion to fashion relief, and noting that only upon proving the rigorous elements of cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), have plaintiffs successfully forced the transfer of an infringing domain name). To the extent that Nissan Motor requests broader relief on account of infringement through initial interest confusion, it is a request better directed to the district court because the injunction was granted on the basis of dilution under the FTDA, not on the basis of infringement.
 
 V
 
 Conclusion
 
 
 66
 Having held that the first use of a mark for purposes of the Federal Trademark Dilution Act is that use which is arguably offending, and such use in this case occurred when NISSAN was used in "Nissan Computer" in commerce, we must reverse and remand the partial summary judgment on dilution for the district court to consider the fame of the NISSAN mark as of 1991. On remand, it must also consider whether Nissan Computer "actually diluted" the NISSAN mark as required by Moseley. Injunctive relief may not restrain Nissan Computer from placing links on nissan.com and nissan.net to other sites that post negative commentary about Nissan Motor; to this extent, the relief granted is overbroad, reaches non-commercial speech, and runs afoul of the FTDA and the First Amendment. On all other issues, we affirm.
 
 
 67
 Each party shall bear its own costs.
 
 
 68
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Public Citizen filed an amicus brief in support of Nissan Computer's appeal
 
 
 [2]
 Nissan Computer argues for the earlier date of 1980, when Uzi Nissan began using his last name for various business enterprises. The district court did not explain why it rejected this possibility, and we do not foreclose considering it afresh on remand. However, based on the arguments made to us we see no basis for holding as a matter of law that Nissan Computer's use amounted to the same, continuous use of the mark since 1980 or that triable issues of fact exist as to it
 
 
 [3]
 The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce —
 (1) on goods when —
 (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
 (B) the goods are sold or transported in commerce, and
 (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.
 15 U.S.C. § 1127.
 
 
 [4]
 Cal. Bus. & Prof.Code § 14330 provides:
 Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.
 
 
 [5]
 See, e.g., Artukovic v. Rison, 784 F.2d 1354, 1355 (9th Cir.1986) (explaining that a stay is warranted if applicant shows probability of success on the merits and likelihood of irreparable injury or serious questions on merits and balance of hardships tipping in its favor). We review the scope of injunctive relief for abuse of discretion. See Idaho Watersheds Project v. Hahn, 307 F.3d 815, 823 (9th Cir.2002). "A district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). On First Amendment challenges, we conduct an independent, de novo review. See Jacobsen v. United States Postal Serv., 993 F.2d 649, 653-54 (9th Cir.1993).