**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHRISTOPHER LAMPARELLO,
          *Plaintiff-Appellant,*

v.

JERRY FALWELL; JERRY FALWELL
MINISTRIES,
          *Defendants-Appellees.*

---

AMERICAN CIVIL LIBERTIES UNION;
ACLU FOUNDATION OF VIRGINIA;
INTELLECTUAL PROPERTY LAW
FACULTY,
          *Amici Supporting Appellant.*

No. 04-2011

CHRISTOPHER LAMPARELLO,
          *Plaintiff-Appellee,*

v.

JERRY FALWELL; JERRY FALWELL
MINISTRIES,
          *Defendants-Appellants.*

---

AMERICAN CIVIL LIBERTIES UNION;
ACLU FOUNDATION OF VIRGINIA;
INTELLECTUAL PROPERTY LAW
FACULTY,
          *Amici Supporting Appellee.*

No. 04-2122

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-03-1503-A)

Argued: May 26, 2005

Decided: August 24, 2005

Before MICHAEL, MOTZ, and KING, Circuit Judges.

———

Reversed and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Michael and Judge King joined.

———

**COUNSEL**

**ARGUED:** Paul Alan Levy, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Christopher Lamparello. John Holbrook Midlen, Jr., MIDLEN LAW CENTER, Chevy Chase, Maryland, for Jerry Falwell and Jerry Falwell Ministries. **ON BRIEF:** Allison M. Zieve, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., for Christopher Lamparello. Phillip R. Malone, Bruce P. Keller, Jeffrey P. Cunard, BERKMAN CENTER FOR INTERNET AND SOCIETY, HARVARD LAW SCHOOL, Cambridge, Massachusetts; Rebecca Tushnet, Visiting Associate Professor of Law, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amici Curiae, Intellectual Property Law Faculty, Supporting Christopher Lamparello. Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia; Michael Adams, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for Amici Curiae, American Civil Liberties Union and American Civil Liberties Union of Virginia Foundation, Inc., Supporting Christopher Lamparello.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Christopher Lamparello appeals the district court's order enjoining him from maintaining a gripe website critical of Reverend Jerry Falwell. For the reasons stated below, we reverse.

I.

Reverend Falwell is "a nationally known minister who has been active as a commentator on politics and public affairs." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 47 (1988). He holds the common law trademarks "Jerry Falwell" and "Falwell," and the registered trademark "Listen America with Jerry Falwell." Jerry Falwell Ministries can be found online at "www.falwell.com," a website which receives 9,000 hits (or visits) per day.

Lamparello registered the domain name "www.fallwell.com" on February 11, 1999, after hearing Reverend Falwell give an interview "in which he expressed opinions about gay people and homosexuality that [Lamparello] considered . . . offensive." Lamparello created a website at that domain name to respond to what he believed were "untruths about gay people." Lamparello's website included headlines such as "Bible verses that Dr. Falwell chooses to ignore" and "Jerry Falwell has been bearing false witness (Exodus 20:16) against his gay and lesbian neighbors for a long time." The site also contained in-depth criticism of Reverend Falwell's views. For example, the website stated:

> Dr. Falwell says that he is on the side of truth. He says that he will preach that homosexuality is a sin until the day he dies. But we believe that if the reverend were to take another thoughtful look at the scriptures, he would discover that they have been twisted around to support an anti-gay political agenda . . . at the expense of the gospel.

Although the interior pages of Lamparello's website did not contain a disclaimer, the homepage prominently stated, "This website is NOT

affiliated with Jerry Falwell or his ministry"; advised, "If you would like to visit Rev. Falwell's website, you may click here"; and provided a hyperlink to Reverend Falwell's website.

At one point, Lamparello's website included a link to the Amazon.com webpage for a book that offered interpretations of the Bible that Lamparello favored, but the parties agree that Lamparello has never sold goods or services on his website. The parties also agree that "Lamparello's domain name and web site at www.fallwell.com," which received only 200 hits per day, "had no measurable impact on the quantity of visits to [Reverend Falwell's] web site at www.falwell.com."

Nonetheless, Reverend Falwell sent Lamparello letters in October 2001 and June 2003 demanding that he cease and desist from using www.fallwell.com or any variation of Reverend Falwell's name as a domain name. Ultimately, Lamparello filed this action against Reverend Falwell and his ministries (collectively referred to hereinafter as "Reverend Falwell"), seeking a declaratory judgment of noninfringement. Reverend Falwell counter-claimed, alleging trademark infringement under 15 U.S.C. § 1114 (2000), false designation of origin under 15 U.S.C. § 1125(a), unfair competition under 15 U.S.C. § 1126 and the common law of Virginia,[1] and cybersquatting under 15 U.S.C. § 1125(d).

---

[1]As the district court noted, although Reverend Falwell "assert[s] a claim under 15 U.S.C. [§] 1126 for a violation of federal unfair competition law, no such cause of action exists. False Designation of Origin is commonly referred to as unfair competition law . . . ." *Lamparello v. Falwell*, 360 F. Supp. 2d 768, 773 n.2 (E.D. Va. 2004). Accordingly, the district court "construed any claim by [Falwell] for violation of federal unfair competition law as a claim for violation of 15 U.S.C. [§] 1125." *Id.* We will do the same. Furthermore, because "[t]he test for trademark infringement and unfair competition under the Lanham Act is essentially the same as that for common law unfair competition under Virginia law because both address the likelihood of confusion as to the source of the goods or services involved," *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 n.10 (4th Cir. 1995), Reverend Falwell's state-law unfair competition claim rises or falls with his federal claims of infringement and false designation of origin. Therefore, we will not analyze his state-law claim separately.

The parties stipulated to all relevant facts and filed cross-motions for summary judgment. The district court granted summary judgment to Reverend Falwell, enjoined Lamparello from using Reverend Falwell's mark at www.fallwell.com, and required Lamparello to transfer the domain name to Reverend Falwell. *Lamparello*, 360 F. Supp.2d at 773, 775. However, the court denied Reverend Falwell's request for statutory damages or attorney fees, reasoning that the "primary motive" of Lamparello's website was "to put forth opinions on issues that were contrary to those of [Reverend Falwell]" and "not to take away monies or to profit." *Id.* at 775.

Lamparello appeals the district court's order; Reverend Falwell cross-appeals the denial of statutory damages and attorney fees. We review *de novo* a district court's ruling on cross-motions for summary judgment. *See People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001) [hereinafter "*PETA*"].

## II.

We first consider Reverend Falwell's claims of trademark infringement and false designation of origin.

## A.

Section 32 of the Lanham Act creates a cause of action against:

> [a]ny person who shall, without the consent of the registrant — (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1). Similarly, Section 43(a) creates a cause of action against:

> [a]ny person who, on or in connection with any goods or services, . . . uses in commerce any word . . . [or] name . . .,

or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which — (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

Both infringement and false designation of origin have five elements. To prevail under either cause of action, the trademark holder must prove:

(1) that it possesses a mark; (2) that the [opposing party] used the mark; (3) that the [opposing party's] use of the mark occurred "in commerce"; (4) that the [opposing party] used the mark "in connection with the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the [opposing party] used the mark in a manner likely to confuse consumers.

*PETA*, 263 F.3d at 364 (citing 15 U.S.C. §§ 1114, 1125, and *Lone Star Steakhouse & Saloon*, 43 F.3d at 930).

Trademark law serves the important functions of protecting product identification, providing consumer information, and encouraging the production of quality goods and services. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995). But protections "'against unfair competition'" cannot be transformed into "'rights to control language.'" *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 462 (4th Cir. 2000) (quoting Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1710-11 (1999)). "Such a transformation" would raise serious First Amendment concerns because it would limit the

ability to discuss the products or criticize the conduct of companies that may be of widespread public concern and importance. Much useful social and commercial discourse

> would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.

*Id.* (internal quotation marks and citations omitted).

Lamparello and his amici argue at length that application of the Lanham Act must be restricted to "commercial speech" to assure that trademark law does not become a tool for unconstitutional censorship. The Sixth Circuit has endorsed this view, *see Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003), and the Ninth Circuit recently has done so as well, *see Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 674 (9th Cir. 2005).

In its two most significant recent amendments to the Lanham Act, the Federal Trademark Dilution Act of 1995 ("FTDA") and the Anticybersquatting Consumer Protection Act of 1999 ("ACPA"), Congress left little doubt that it did not intend for trademark laws to impinge the First Amendment rights of critics and commentators. The dilution statute applies to only a "commercial use in commerce of a mark," 15 U.S.C. § 1125(c)(1), and explicitly states that the "[n]oncommercial use of a mark" is not actionable. *Id.* § 1125(c)(4). Congress explained that this language was added to "adequately address[ ] legitimate First Amendment concerns," H.R. Rep. No. 104-374, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1031, and "incorporate[d] the concept of 'commercial' speech from the 'commercial speech' doctrine." *Id.* at 8, *reprinted in* 1995 U.S.C.C.A.N. at 1035; *cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001) (defining commercial speech as "speech proposing a commercial transaction") (internal quotation marks and citation omitted). Similarly, Congress directed that in determining whether an individual has engaged in cybersquatting, the courts may consider whether the person's use of the mark is a "bona fide noncommercial or fair use." 15 U.S.C. § 1125(d)(1)(B)(i)(IV). The legislature believed this provision necessary to "protect[ ] the rights of Internet users and the interests of all Americans in free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc." S. Rep. No. 106-140 (1999), 1999 WL 594571, at *8.

In contrast, the trademark infringement and false designation of origin provisions of the Lanham Act (Sections 32 and 43(a), respectively) do not employ the term "noncommercial." They do state, however, that they pertain only to the use of a mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services," 15 U.S.C. § 1114(1)(a), or "in connection with any goods or services," *id.* § 1125(a)(1). But courts have been reluctant to define those terms narrowly.[2] Rather, as the Second Circuit has explained, "[t]he term 'services' has been interpreted broadly" and so "[t]he Lanham Act has . . . been applied to defendants furnishing a wide variety of non-commercial public and civic benefits." *United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 89-90 (2d Cir. 1997). Similarly, in *PETA* we noted that a website need not actually sell goods or services for the use of a mark in that site's domain name to constitute a use "'in connection with' goods or services." *PETA*, 263 F.3d at 365; *see also Taubman Co.*, 319 F.3d at 775 (concluding that website with *two* links to websites of for-profit entities violated the Lanham Act).

Thus, even if we accepted Lamparello's contention that Sections 32 and 43(a) of the Lanham Act apply only to commercial speech, we would still face the difficult question of what constitutes such speech under those provisions. In the case at hand, we need not resolve that question or determine whether Sections 32 and 43(a) apply exclusively to commercial speech because Reverend Falwell's claims of trademark infringement and false designation fail for a more obvious reason. The hallmark of such claims is a likelihood of confusion — and there is no likelihood of confusion here.

### B.

### 1.

"[T]he use of a competitor's mark that does not cause confusion as to source is permissible." *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 380 (7th Cir. 1996). Accordingly, Lamparello can only be

---

[2]Indeed, Lamparello agreed at oral argument that the Lanham Act's prohibitions on infringement and false designation apply to more than just commercial speech as defined by the Supreme Court.

liable for infringement and false designation if his use of Reverend Falwell's mark would be likely to cause confusion as to the source of the website found at www.fallwell.com. This likelihood-of-confusion test "generally strikes a comfortable balance" between the First Amendment and the rights of markholders. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002).

We have identified seven factors helpful in determining whether a likelihood of confusion exists as to the source of a work, but "not all these factors are always relevant or equally emphasized in each case." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (internal quotation marks, citations, and brackets omitted). The factors are: "(a) the strength or distinctiveness of the mark; (b) the similarity of the two marks; (c) the similarity of the goods/services the marks identify; (d) the similarity of the facilities the two parties use in their businesses; (e) the similarity of the advertising used by the two parties; (f) the defendant's intent; (g) actual confusion." *Id.* (citation omitted).

Reverend Falwell's mark is distinctive, and the domain name of Lamparello's website, www.fallwell.com, closely resembles it. But, although Lamparello and Reverend Falwell employ similar marks online, Lamparello's website looks nothing like Reverend Falwell's; indeed, Lamparello has made no attempt to imitate Reverend Falwell's website. Moreover, Reverend Falwell does not even argue that Lamparello's website constitutes advertising or a facility for business, let alone a facility or advertising similar to that of Reverend Falwell. Furthermore, Lamparello clearly created his website intending only to provide a forum to criticize ideas, not to steal customers.

Most importantly, Reverend Falwell and Lamparello do not offer similar goods or services. Rather they offer opposing ideas and commentary. Reverend Falwell's mark identifies his spiritual and political views; the website at www.fallwell.com criticizes those very views. After even a quick glance at the content of the website at www.fallwell.com, no one seeking Reverend Falwell's guidance would be misled by the domain name — www.fallwell.com — into believing Reverend Falwell authorized the content of that website. No one would believe that Reverend Falwell sponsored a site criticizing himself, his positions, and his interpretations of the Bible. *See New*

*Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308-09 (9th Cir. 1992) (stating that use of a mark to solicit criticism of the markholder implies the markholder is not the sponsor of the use).[3]

Finally, the fact that people contacted Reverend Falwell's ministry to report that they found the content at www.fallwell.com antithetical to Reverend Falwell's views does not illustrate, as Reverend Falwell claims, that the website engendered actual confusion. To the contrary, the anecdotal evidence Reverend Falwell submitted shows that those searching for Reverend Falwell's site and arriving instead at Lamparello's site quickly realized that Reverend Falwell was *not* the source of the content therein.

For all of these reasons, it is clear that the undisputed record evidences no likelihood of confusion. In fact, Reverend Falwell even conceded at oral argument that those viewing the content of Lamparello's website probably were unlikely to confuse Reverend Falwell with the source of that material.

2.

Nevertheless, Reverend Falwell argues that he is entitled to prevail under the "initial interest confusion" doctrine. This relatively new and sporadically applied doctrine holds that "the Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Dorr-Oliver*, 94 F.3d at 382. According to Reverend Falwell, this doctrine requires us to compare his mark with Lamparello's    website    domain    name,    www.fallwell.com,    *without*

---

[3]If Lamparello had neither criticized Reverend Falwell by name nor expressly rejected Reverend Falwell's teachings, but instead simply had quoted Bible passages and offered interpretations of them subtly different from those of Reverend Falwell, this would be a different case. For, while a gripe site, or a website dedicated to criticism of the markholder, will seldom create a likelihood of confusion, a website purporting to be the official site of the markholder and, for example, articulating positions that could plausibly have come from the markholder may well create a likelihood of confusion.

considering the content of Lamparello's website. Reverend Falwell argues that some people who misspell his name may go to www.fallwell.com assuming it is his site, thus giving Lamparello an unearned audience — albeit one that quickly disappears when it realizes it has not reached Reverend Falwell's site. This argument fails for two reasons.

First, we have never adopted the initial interest confusion theory; rather, we have followed a very different mode of analysis, requiring courts to determine whether a likelihood of confusion exists by "examin[ing] the allegedly infringing use *in the context in which it is seen by the ordinary consumer*." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992) (emphasis added) (citing cases); *see also What-A-Burger of Va., Inc. v. WHATABURGER, Inc.*, 357 F.3d 441, 450 (4th Cir. 2004).

Contrary to Reverend Falwell's arguments, we did not abandon this approach in *PETA*. Our inquiry in *PETA* was limited to whether Doughney's use of the domain name "www.peta.org" constituted a successful enough parody of People for the Ethical Treatment of Animals that no one was likely to believe www.peta.org was sponsored or endorsed by that organization. For a parody to be successful, it "must convey two simultaneous — and contradictory — messages: that it is the original, but also that it is *not* the original and is instead a parody." *PETA*, 263 F.3d at 366 (internal quotation marks and citation omitted). Doughney argued that his domain name conveyed the first message (that it was PETA's website) and that the content of his website conveyed the requisite second message (that it was not PETA's site). *Id.* Although "[t]he website's content ma[de] it clear that it [wa]s not related to PETA," *id.*, we concluded that the website's content could not convey the requisite second message because the site's content "[wa]s not conveyed *simultaneously* with the first message, [i.e., the domain name itself,] as required to be considered a parody." *Id.* at 366. Accordingly, we found the "district court properly rejected Doughney's parody defense." *Id.* at 367.

*PETA* simply outlines the parameters of the parody defense; it does not adopt the initial interest confusion theory or otherwise diminish the necessity of examining context when determining whether a likelihood of confusion exists. Indeed, in *PETA* itself, rather than embrac-

ing a new approach, we reiterated that "[t]o determine whether a likelihood of confusion exists, a court should not consider how closely a *fragment* of a given use duplicates the trademark, but must instead consider *whether the use in its entirety creates a likelihood of confusion*." *Id.* at 366 (internal quotation marks and citation omitted) (emphasis added). When dealing with domain names, this means a court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name.[4]

Moreover, even if we did endorse the initial interest confusion theory, that theory would not assist Reverend Falwell here because it provides no basis for liability in circumstances such as these. The few appellate courts that have followed the Ninth Circuit and imposed liability under this theory for using marks on the Internet have done so only in cases involving a factor utterly absent here — one business's use of another's mark for its own financial gain. *See, e.g.*, *PACCAR Inc. v. Telescan Techs., L.L.C.*, 319 F.3d 243, 253 (6th Cir. 2003); *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002); *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1055-56 (9th Cir. 1999).

Profiting financially from initial interest confusion is thus a key element for imposition of liability under this theory.[5] When an alleged

---

[4]Contrary to Reverend Falwell's suggestions, this rule does not change depending on how similar the domain name or title is to the mark. Hence, Reverend Falwell's assertion that he objects only to Lamparello using the domain name www.fallwell.com and has no objection to Lamparello posting his criticisms at "www.falwelliswrong.com," or a similar domain name, does not entitle him to a different evaluation rule. Rather it has long been established that even when alleged infringers use the *very marks at issue* in titles, courts look to the underlying *content* to determine whether the titles create a likelihood of confusion as to source. *See, e.g.*, *Parks v. LaFace Records*, 329 F.3d 437, 452-54 (6th Cir. 2003); *Mattel*, 296 F.3d at 901-02; *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 667-68 (5th Cir. 2000); *Rogers v. Grimaldi*, 875 F.2d 994, 1000-01 (2d Cir. 1989).

[5]Offline uses of marks found to cause actionable initial interest confusion also have involved financial gain. *See Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 204 (5th Cir. 1998); *Mobil Oil Corp. v. Pegasus*

infringer does not compete with the markholder for sales, "some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement. Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis." *Checkpoint Sys.*, 269 F.3d at 296-97. For this reason, even the Ninth Circuit has stated that a firm is not liable for using another's mark in its domain name if it "could not financially capitalize on [a] misdirected consumer [looking for the markholder's site] even if it so desired." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002).

This critical element — use of another firm's mark to capture the markholder's customers and profits — simply does not exist when the alleged infringer establishes a gripe site that criticizes the markholder. *See* Hannibal Travis, *The Battle For Mindshare: The Emerging Consensus that the First Amendment Protects Corporate Criticism and Parody on the Internet*, 10 Va. J.L. & Tech. 3, 85 (Winter 2005) ("The premise of the 'initial interest' confusion cases is that by using the plaintiff's trademark to divert its customers, the defendant is engaging in the old 'bait and switch.' But because . . . Internet users who find [gripe sites] are not sold anything, the mark may be the 'bait,' but there is simply no 'switch.'") (citations omitted).[6] Applying

*Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987). And even those courts recognizing the initial interest confusion theory of liability but finding no actionable initial confusion involved one business's use of another's mark for profit. *See, e.g.*, *Savin Corp. v. The Savin Group*, 391 F.3d 439, 462 n.13 (2d Cir. 2004); *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 827-28 (7th Cir. 2002); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298 (3d Cir. 2001); *Hasbro, Inc. v. Clue Computing, Inc.*, 232 F.3d 1, 2 (1st Cir. 2000); *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 638 (7th Cir. 1999); *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997); *Dorr-Oliver*, 94 F.3d at 383.

[6]Although the appellate courts that have adopted the initial interest confusion theory have only applied it to profit-seeking uses of another's mark, the district courts have not so limited the application of the theory. Without expressly referring to this theory, two frequently-discussed district court cases have held that using another's domain name to post con-

the initial interest confusion theory to gripe sites like Lamparello's would enable the markholder to insulate himself from criticism — or at least to minimize access to it. We have already condemned such uses of the Lanham Act, stating that a markholder cannot "'shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct.'" *CPC Int'l*, 214 F.3d at 462 (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987)). "[J]ust because speech is critical of a corporation and its business practices is not a sufficient reason to enjoin the speech." *Id.*

In sum, even if we were to accept the initial interest confusion theory, that theory would not apply in the case at hand. Rather, to determine whether a likelihood of confusion exists as to the source of a gripe site like that at issue in this case, a court must look not only to the allegedly infringing domain name, but also to the underlying content of the website. When we do so here, it is clear, as explained above, that no likelihood of confusion exists. Therefore, the district court erred in granting Reverend Falwell summary judgment on his infringement, false designation, and unfair competition claims.

## III.

We evaluate Reverend Falwell's cybersquatting claim separately because the elements of a cybersquatting violation differ from those of traditional Lanham Act violations. To prevail on a cybersquatting claim, Reverend Falwell must show that Lamparello: (1) "had a bad

---

tent antithetical to the markholder constitutes infringement. *See Planned Parenthood Fed'n of Am., Inc. v. Bucci*, No. 97 Civ. 0629, 1997 WL 133313 (S.D.N.Y. March 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998) (table) (finding use of domain name "www.plannedparenthood.com" to provide links to passages of anti-abortion book constituted infringement); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282 (D.N.J. 1998), *aff'd*, 159 F.3d 1351 (3d Cir. 1998) (table) (finding use of "www.jewsforjesus.org" to criticize religious group constituted infringement). We think both cases were wrongly decided to the extent that in determining whether the domain names were confusing, the courts did not consider whether the websites' content would dispel any confusion. In expanding the initial interest confusion theory of liability, these cases cut it off from its moorings to the detriment of the First Amendment.

faith intent to profit from using the [www.fallwell.com] domain name," and (2) the domain name www.fallwell.com "is identical or confusingly similar to, or dilutive of, the distinctive and famous [Falwell] mark." *PETA*, 263 F.3d at 367 (citing 15 U.S.C. § 1125(d)(1)(A)).

"The paradigmatic harm that the ACPA was enacted to eradicate" is "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004). The Act was also intended to stop the registration of multiple marks with the hope of selling them to the highest bidder, "distinctive marks to defraud consumers" or "to engage in counterfeiting activities," and "well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, many of which are pornography sites that derive advertising revenue based on the number of visits, or 'hits,' the site receives." S. Rep. No. 106-140, 1999 WL 594571, at *5-6. The Act was not intended to prevent "noncommercial uses of a mark, such as for comment, criticism, parody, news reporting, etc.," and thus they "are beyond the scope" of the ACPA. *Id.* at *9.

To distinguish abusive domain name registrations from legitimate ones, the ACPA directs courts to consider nine nonexhaustive factors:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of the registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i); *see also* H.R. Rep. No. 106-412 (1999), 1999 WL 970519, at *10.

These factors attempt "to balance the property interests of trademark owners with the legitimate interests of Internet users and others

who seek to make lawful uses of others' marks, including for purposes such as comparative advertising, *comment*, *criticism*, parody, news reporting, fair use, etc." H.R. Rep. No. 106-412, 1999 WL 970519, at *10 (emphasis added). "The first four [factors] suggest circumstances that may tend to indicate an absence of bad-faith intent to profit from the goodwill of a mark, and the others suggest circumstances that may tend to indicate that such bad-faith intent exists." *Id.* However, "[t]here is no simple formula for evaluating and weighing these factors. For example, courts do not simply count up which party has more factors in its favor after the evidence is in." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 234 (4th Cir. 2002). In fact, because use of these listed factors is permissive, "[w]e need not . . . march through" them all in every case. *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001). "The factors are given to courts as a guide, not as a substitute for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Lucas Nursery & Landscaping*, 359 F.3d at 811.

After close examination of the undisputed facts involved in this case, we can only conclude that Reverend Falwell cannot demonstrate that Lamparello "had a bad faith intent to profit from using the [www.fallwell.com] domain name." *PETA*, 263 F.3d at 367. Lamparello clearly employed www.fallwell.com simply to criticize Reverend Falwell's views. Factor IV of the ACPA, 15 U.S.C. § 1125(d)(1)(B)(i)(IV), counsels against finding a bad faith intent to profit in such circumstances because "use of a domain name for purposes of . . . comment, [and] criticism," H.R. Rep. No. 106-412, 1999 WL 970519, at *11, constitutes a "bona fide noncommercial or fair use" under the statute, 15 U.S.C. § 1125(d)(1)(B)(i)(IV).[7] That Lamparello provided

---

[7]We note that factor IV does not protect a faux noncommercial site, that is, a noncommercial site created by the registrant for the sole purpose of avoiding liability under the FTDA, which exempts noncommercial uses of marks, *see* 15 U.S.C. § 1125(c)(4)(B), or under the ACPA. As explained by the Senate Report discussing the ACPA, an individual cannot avoid liability for registering and attempting to sell a hundred domain names incorporating famous marks by posting noncommercial content at those domain names. *See* S. Rep. No. 106-140, 1999 WL 594571, at *14 (citing *Panavision Int'l v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998)). But Lamparello's sole purpose for registering www.fallwell.com was to criticize Reverend Falwell, and this noncommercial use was not a ruse to avoid liability. Therefore, factor IV indicates that Lamparello did not have a bad faith intent to profit.

a link to an Amazon.com webpage selling a book he favored does not diminish the communicative function of his website. The use of a domain name to engage in criticism or commentary "even where done for profit" does not alone evidence a bad faith intent to profit, H.R. Rep. No. 106-412, 1999 WL 970519, at *11, and Lamparello did not even stand to gain financially from sales of the book at Amazon.com. Thus factor IV weighs heavily in favor of finding Lamparello lacked a bad faith intent to profit from the use of the domain name.

Equally important, Lamparello has not engaged in the type of conduct described in the statutory factors as typifying the bad faith intent to profit essential to a successful cybersquatting claim. First, we have already held, *supra* Part II.B, that Lamparello's domain name does not create a likelihood of confusion as to source or affiliation. Accordingly, Lamparello has not engaged in the type of conduct — "creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site," 15 U.S.C. § 1125(d)(1)(B)(i)(V) — described as an indicator of a bad faith intent to profit in factor V of the statute.

Factors VI and VIII also counsel against finding a bad faith intent to profit here. Lamparello has made no attempt — or even indicated a willingness — "to transfer, sell, or otherwise assign the domain name to [Reverend Falwell] or any third party for financial gain." 15 U.S.C. § 1125(d)(1)(B)(i)(VI). Similarly, Lamparello has not registered "multiple domain names," 15 U.S.C. § 1125(d)(1)(B)(i)(VIII); rather, the record indicates he has registered only one. Thus, Lamparello's conduct is not of the suspect variety described in factors VI and VIII of the Act.

Notably, the case at hand differs markedly from those in which the courts have found a bad faith intent to profit from domain names used for websites engaged in political commentary or parody. For example, in *PETA* we found the registrant of www.peta.org engaged in cybersquatting because www.peta.org was one of *fifty* to *sixty* domain names Doughney had registered, *PETA*, 263 F.3d at 362, and because Doughney had evidenced a clear intent to sell www.peta.org to PETA, stating that PETA should try to "'settle' with him and 'make him an offer.'" *Id.* at 368. *See also Virtual Works*, 238 F.3d at 269-70. Similarly, in *Coca-Cola Co. v. Purdy*, 382 F.3d 774 (8th Cir. 2004),

the Eighth Circuit found an anti-abortion activist who had registered domain names incorporating famous marks such as "Washington Post" liable for cybersquatting because he had registered almost *seventy* domain names, had offered to stop using the Washington Post mark if the newspaper published an opinion piece by him on its editorial page, and posted content that created a likelihood of confusion as to whether the famous markholders sponsored the anti-abortion sites and "ha[d] taken positions on hotly contested issues." *Id.* at 786. In contrast, Lamparello did not register multiple domain names, he did not offer to transfer them for valuable consideration, and he did not create a likelihood of confusion.

Instead, Lamparello, like the plaintiffs in two cases recently decided by the Fifth and Sixth Circuits, created a gripe site. Both courts expressly refused to find that gripe sites located at domain names nearly identical to the marks at issue violated the ACPA. In *TMI, Inc. v. Maxwell*, 368 F.3d 433, 434-35 (5th Cir. 2004), Joseph Maxwell, a customer of homebuilder TMI, registered the domain name "www.trendmakerhome.com," which differed by only one letter from TMI's mark, TrendMaker Home*s*, and its domain name, "www.trendmakerhome*s*.com." Maxwell used the site to complain about his experience with TMI and to list the name of a contractor whose work pleased him. After his registration expired, Maxwell registered "www.trendmakerhome.info." TMI then sued, alleging cybersquatting. The Fifth Circuit reversed the district court's finding that Maxwell violated the ACPA, reasoning that his site was noncommercial and designed only "to inform potential customers about a negative experience with the company." *Id.* at 438-39.

Similarly, in *Lucas Nursery & Landscaping*, a customer of Lucas Nursery registered the domain name "www.lucasnursery.com" and posted her dissatisfaction with the company's landscaping services. Because the registrant, Grosse, like Lamparello, registered a single domain name, the Sixth Circuit concluded that her conduct did not constitute that which Congress intended to proscribe — i.e., the registration of multiple domain names. *Lucas Nursery & Landscaping*, 359 F.3d at 810. Noting that Grosse's gripe site did not create any confusion as to sponsorship and that she had never attempted to sell the domain name to the markholder, the court found that Grosse's conduct was not actionable under the ACPA. The court explained: "One

of the ACPA's main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands. The practice of informing fellow consumers of one's experience with a particular service provider is surely not inconsistent with this ideal." *Id.* at 811.

Like Maxwell and Grosse before him, Lamparello has not evidenced a bad faith intent to profit under the ACPA. To the contrary, he has used www.fallwell.com to engage in the type of "comment[ ] [and] criticism" that Congress specifically stated militates against a finding of bad faith intent to profit. *See* S. Rep. No. 106-140, 1999 WL 594571, at *14. And he has neither registered multiple domain names nor attempted to transfer www.fallwell.com for valuable consideration. We agree with the Fifth and Sixth Circuits that, given these circumstances, the use of a mark in a domain name for a gripe site criticizing the markholder does not constitute cybersquatting.

## IV.

For the foregoing reasons, Lamparello, rather than Reverend Falwell, is entitled to summary judgment on all counts.[8] Accordingly, the judgment of the district court is reversed and the case is remanded for entry of judgment for Lamparello.

*REVERSED AND REMANDED*

---

[8]Given our resolution of Lamparello's appeal, Reverend Falwell's cross-appeal with respect to statutory damages and attorney fees is moot.