**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CPC INTERNATIONAL, INCORPORATED,
Plaintiff-Appellee,

v.

SKIPPY INCORPORATED; JOAN CROSBY

No. 99-2318

TIBBETTS,
Defendants-Appellants.

AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA, INCORPORATED,
Amicus Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Richard L. Williams, Senior District Judge.
(CA-86-109-1-A)

Argued: April 5, 2000

Decided: June 2, 2000

Before WILKINSON, Chief Judge, and
WILKINS and WILLIAMS, Circuit Judges.

_____

Vacated and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Wilkins and Judge Williams
joined.

_____

**COUNSEL**

**ARGUED:** Rodney Ray Sweetland, III, Arlington, Virginia, for
Appellants. William Mack Webner, SUGHRUE, MION, ZINN,

MACPEAK & SEAS, P.L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** Dov Szego, Williamsburg, Virginia; Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, Richmond, Virginia, for Amicus Curiae.

_____

## OPINION

WILKINSON, Chief Judge:

This case involves a protracted dispute over the use of the trademark SKIPPY. In 1986, CPC International, the maker of Skippy Peanut Butter, brought suit against Skippy, Incorporated, for trademark infringement and unfair competition. The district court enjoined Skippy from communicating that CPC has no rights in the trademark SKIPPY for food products. In 1998, Skippy created the web site Skippy.com. CPC alleged that the web site violated the 1986 order, and the district court ordered Skippy to remove about ten pages of material from its web site. Because the district court's injunction lacks the findings and specificity required by Fed. R. Civ. P. 65(d) and because its substantial breadth raises serious First Amendment concerns, we vacate the injunction and remand for further proceedings.

I.

In 1923, Percy L. Crosby created a cartoon featuring a school-aged child named Skippy. The cartoon was syndicated and the Skippy character was marketed in cartoon books, magazine articles, and novels. Crosby obtained a federal trademark SKIPPY for cartoons depicting the humorous juvenile character. This mark was transferred to appellant Skippy, Incorporated, sometime after 1932. Appellant Joan Crosby Tibbetts is Percy Crosby's daughter and the current president of Skippy. Skippy currently owns a trademark SKIPPY for the cartoon comic strip.

CPC International and its predecessors have sold peanut butter in the United States under the trademark SKIPPY since 1933. CPC owns a federal trademark SKIPPY for peanut butter.

2

In 1986, CPC brought suit alleging that Skippy had engaged in trademark infringement and unfair competition. Skippy had licensed the right to use "the word mark SKIPPY, the comic strip SKIPPY, [and] the fanciful character SKIPPY" on the packaging of caramel corn, popcorn, and nuts. CPC Int'l, Inc. v. Skippy, Inc., 651 F. Supp. 62, 65 (E.D. Va. 1986). The district court found that the use of the mark SKIPPY on caramel corn or any other food product constituted trademark infringement because it would create a likelihood of confusion with CPC's trademark in SKIPPY Peanut Butter. See id. at 67.

Accordingly, the district court issued an order (the 1986 order) that enjoined Skippy and Joan Tibbetts (1) "from continuing to offer to license, offer to sell, distribute, advertise or promote a caramel corn and peanut product or any other food product under the trademark SKIPPY or any mark confusingly similar thereto"; and (2) "from communicating in any manner with anyone that [Skippy's] rights in the trademark SKIPPY include the right to use SKIPPY on peanut butter and food products and, conversely, that CPC has no rights in the SKIPPY trademark in connection with these products."

In 1997, Skippy registered the domain name Skippy.com. The web site recounted the "Life and Times" of Percy Crosby, including his childhood, military career, and the popular success enjoyed by the Skippy cartoon character. It also included stories of an FBI investigation, "CPC's Malicious Prosecution," and "CPC's Fraud on the Courts." A "legal notice" on the web site stated "SKIPPY and the image of the character SKIPPY are trademarks and copyrights of SKIPPY, INC. Neither these marks nor the copyrighted works of Percy Crosby may be used without the permission of SKIPPY, INC."

The instant case arises out of CPC's motion to show cause why Skippy and Tibbetts should not be held in contempt of the 1986 order. On September 9, 1999, the district court ordered Skippy and Tibbetts to remove permanently significant portions of the web site. The passages to be deleted were highlighted and attached to the order. The court also enjoined appellants from "providing others with any of the deleted material on the Skippy.com website or any material that violates the Court's [1986 order]." On September 21, 1999, the district court entered a final order, which provided that upon showing of further violations of the 1986 order the court would impose a $500 per

3

day damage award against appellants. Skippy and Tibbetts now appeal.

II.

It is important at the outset to define the precise focus of this lawsuit. This is not a defamation suit, and it is only an unfair competition suit insofar as it challenges Skippy's compliance with the 1986 order. The case involves solely CPC's motion to show cause why Skippy should not be held in contempt for violation of the 1986 order. Rather than addressing Skippy's conduct under the terms of that order, the district court simply issued a sweeping injunction requiring the wholesale removal of material from Skippy's web site.

We find that the district court's injunctive decree suffers from two related deficiencies. First, the injunction fails to comply with the terms of Fed. R. Civ. P. 65(d). Second, the injunction's substantial overbreadth raises serious First Amendment concerns. We shall address each of these problems in turn.

A.

Rule 65(d) provides, "Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail . . . the act or acts sought to be restrained." Rule 65(d) applies to the district court's 1999 order because it is an "order granting an injunction." In fact, Rule 65(d) applies generally to "equitable decree[s] compelling obedience under the threat of contempt." International Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 75 (1967).

The terms of Rule 65(d) "are mandatory and must be observed in every instance." Thomas v. Brock, 810 F.2d 448, 450 (4th Cir. 1987) (internal quotation marks omitted). "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 476 (1974); accord Hughey v. JMS Dev.

4

Corp., 78 F.3d 1523, 1531 (11th Cir. 1996); Town of Islip v. Eastern Air Lines, Inc., 793 F.2d 79, 83 (2d Cir. 1986). Moreover, without specificity, appellate review of an injunctive order is "greatly complicated, if not made impossible." Schmidt, 414 U.S. at 477. Rule 65(d) thus serves the twin purposes of providing fair notice of what an injunction requires and of facilitating appellate review. See Consumers Gas & Oil, Inc. v. Farmland Indus., 84 F.3d 367, 371 (10th Cir. 1996).

The district court's 1999 order states: "Defendants shall permanently remove the highlighted passages and titles shown on the attached Schedule A from anywhere in the Skippy.com Internet website . . . and shall not republish that deleted material or have that deleted material republished by others." In the attached Schedule A, the court simply lists and highlights what should be removed -- about ten pages of material. The injunction thus silences a substantial quantity of speech from Skippy's web site, including commentary on the ongoing litigation and the alleged mistreatment of Skippy cartoon creator Percy Crosby. Yet the district court does not explain how these statements violate the 1986 order. There are no findings that relate the redacted statements to the 1986 order. Nor are there any reasons given for issuance of the injunction. What is to be removed is clear from the order; however, the reason for redacting these materials is not. Such a terse and sweeping injunction does not comply with the requirements of Rule 65(d).

It is not clear to us how Skippy's web site violated either part of the 1986 order. The 1986 order first enjoined Skippy from offering to license or promote "a caramel corn and peanut product or any other food product under the trademark SKIPPY or any mark confusingly similar thereto." There is no allegation here that Skippy has licensed or sold its trademark for the promotion or packaging of any food product.

The 1986 order also enjoined Skippy from "communicating in any manner" that its rights in the SKIPPY trademark "include the right to use SKIPPY on peanut butter and food products and, conversely, that CPC has no rights in the SKIPPY trademark in connection with these products." CPC makes much of the fact that some of the redacted statements are false and allege that CPC "pirated" and "stole" the

5

SKIPPY trademark. The web site at various points claims that CPC's ownership of the trademark SKIPPY was procured by wrongful actions. Yet rather than denying CPC's ownership of the mark, these comments presuppose that CPC now owns the trademark SKIPPY for peanut butter and food products. The statements largely reflect Ms. Tibbetts' opinion that CPC's ownership is unjust and that it was made possible only through decades of "predatory conduct." The district court did not explain how these statements assert appellants' right to use SKIPPY on peanut butter or food products. Nor did the district court specify how the statements communicate that CPC has no rights in the SKIPPY trademark. The redacted portions include the following statements:

> During this time, Crosby's famous Skippy trademark and its valuable good will was pirated by a bankrupt peanut butter company, which later merged with a Fortune 500 company, making a fortune in illicit sales under the Skippy brand name.

> Percy Crosby referred to the NRA as Roosevelt's "New Russian Administration", unaware that it was by means of the NRA peanut butter code that a bankrupt California food packer (Rosefield) would steal Skippy and make a fortune.

> In 1933, Rosefield Packing Co., Ltd., attempted to register Skippy as a federal trademark for peanut butter, using the same fence theme with Skippy's bucket of red paint and artist's brush, and Crosby's distinctive Skippy lettering on the fence. Skippy, Inc. immediately filed suit in the U.S. Patent Office through Skippy's counsel, Lord, Day & Lord, and prevailed.

> Scores of consumers boycotted Skippy peanut butter in protest, and I filed a complaint with the Justice Department at the assistant U.S. Attorney's request. Notably, CPC never advised its stockholders or the Securities & Exchange Commission of its alleged victories in the Skippy litigation, knowing full well that title to stolen property can not be conveyed.

This is but a small sample of the many statements that the district court ordered removed. These comments seem largely to express the opinions of Ms. Tibbetts -- her historical account of her family's struggles with CPC and the government, and her belief that she and her father had been wronged. The most problematic parts of the web site involve allegations of illegality on the part of CPC, which may suggest, in violation of the 1986 order, that CPC possesses no rights in the SKIPPY trademark. If these limited parts of the redacted material run afoul of the 1986 order, the district court must explain on remand precisely how the statements violate the order.

The district court also ordered Skippy to remove statements discussing the pending lawsuit:

> Immediately after the release of this web site, CPC filed a motion in court to silence Joan Crosby Tibbetts from publishing the true story of Skippy. Ms. Tibbetts is in need of your support to help protect the property rights of Skippy that her father lived and died to preserve. For more information on how you can help, please email Joan Crosby Tibbetts. Your support of Skippy is very much appreciated!

The district court went so far as to order removal of the following statement from fourteen locations on the web site:

> Due to a pending lawsuit from [CPC], this portion of the story has been temporarily deleted.

In addition, the court ordered removal of several passages that criticized CPC's lawyers for conflicts of interest:

> [Mr. Tibbetts'] greatest anguish was at the rank betrayal of the attorneys we hired and paid to expose fraud and CPC's Skippy criminal enterprise, who remained silent in the fact [sic] of a clear duty to speak and inform federal authorities of fraud on the government.

Further the district court ordered removal of a Skippy cartoon reprinted from Life magazine with the added caption"Why is [CPC]

7

bullying the little Skippy once again?" It is unclear how these comments and cartoons concerning the litigation between Skippy and CPC relate to the proscribed conduct, because they seem mainly to solicit assistance with pending litigation and to criticize CPC for its legal actions.

If these editorial and historical comments violate the 1986 order, the court has not made any findings to that effect. Under Rule 65(d), a proper injunction would identify specific passages and explain how they violate the 1986 order. Editorial comments about the history of Skippy and CPC that do not touch on these enjoined topics must be allowed to remain on the web site.

B.

The absence of proper findings serves to illuminate a further defect in the district court's order. The injunction against Skippy is not narrowly tailored to remedy specific violations of the 1986 order. As such it implicates serious First Amendment concerns.

The First Amendment prohibits not only statutory abridgment but also judicial action that restrains free speech. See New Orleans Steamship Ass'n v. General Longshore Workers, ILA Local 1418, 626 F.2d 455, 462 (5th Cir. 1980). The Supreme Court has recognized the risks of overbroad injunctions, especially when First Amendment considerations are at stake. An injunction must "burden no more speech than necessary to serve a significant government interest." Madsen v. Women's Health Center, Inc., 512 U.S. 753, 765 (1994); see also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 924 n.67 (1982) (injunction must be vacated or "modified to restrain only unlawful conduct"). Injunctions must be narrowly tailored and should prohibit only unlawful conduct. An "order must be tailored as precisely as possible to the exact needs of the case." Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 184 (1968).

The district court failed to articulate any correlation between the redactions and the government's interest in enforcing trademark law. The basic objectives of trademark law are to encourage product differentiation, promote the production of quality goods, and provide consumers with information about the quality of goods. See Qualitex

8

Co. v. Jacobson Prods. Co., 514 U.S. 159, 163-64 (1995). It is hard to see what "significant government interest" is served here. CPC's trademark has not been used for any commercial gain, nor has the trademark been used in a way that confuses the public. See Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 321-22 (4th Cir. 1992). In the 1986 case, the district court found that when Skippy licensed the SKIPPY trademark for use on food products this constituted unfair competition because of the possibility of confusion between the caramel corn products and CPC's Skippy Peanut Butter. See CPC Int'l, 651 F. Supp. at 67. The web site, however, does not create any such confusion between the Skippy cartoon character and Skippy Peanut Butter. While there certainly is a strong state interest in preventing trademark infringement and unfair competition, there has been no finding that suppressing significant portions of Skippy's web site serves such an interest.

First Amendment interests are at stake here because Ms. Tibbetts tells her side of the story on the Skippy web site-- how a big corporation worked to steal her father's cartoon trademark and then used the trademark to make a fortune. This is an admittedly partisan account and one that vexes CPC. Yet just because speech is critical of a corporation and its business practices is not a sufficient reason to enjoin the speech. As the First Circuit stated, if a trademark owner could "enjoin the use of his mark in a noncommercial context found to be negative or offensive, then a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct." L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 33 (1st Cir. 1987).

It is important that trademarks not be "transformed from rights against unfair competition to rights to control language." Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1710-11 (1999). Such a transformation would diminish our ability to discuss the products or criticize the the conduct of companies that may be of widespread public concern and importance. See id. "Much useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark." New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 307 (9th Cir. 1992). The 1999 injunction

9

broadly removes most of the speech on the web site. By redacting purely editorial and historical comments, the injunction is not narrowly tailored. The Constitution will not tolerate such a wholesale suppression of speech.

Contrary to CPC's assertions, there is no reason to deny full First Amendment protection to Skippy. The redacted portions of the web site are not commercial speech. Speech is commercial in nature if it does "no more than propose a commercial transaction." Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976) (internal quotation marks omitted). Here, the only place where a commercial transaction was even conceivably proposed was in Skippy's "legal notice," which states "for information about licensing these images and trademarks, please contact Joan Crosby Tibbetts." Indeed, this warning was not even among the redacted portions of the web site, and continues to be displayed.

Beyond the warning, the original web site did not offer any products for sale or represent that Skippy possessed the trademark for use on food products.[1] The web site served a primarily informational purpose, not a commercial one. The instant case is thus distinguishable from Board of Trustees of the State University v. Fox, in which the Supreme Court held that "Tupperware parties" that offered products for sale constituted commercial speech notwithstanding the fact that they included discussions on home economics. 492 U.S. 469, 474-75 (1989). This case is also distinct from Bolger v. Youngs Drug Products Corporation, which held that advertising pamphlets for contraceptives were commercial speech even though they contained factual information about public issues such as family planning. 463 U.S. 60, 67-68 (1983). Both Fox and Bolger involved commercial speech supplemented by comments related to the marketed product.

By contrast, the speech on the Skippy web site did not propose a commercial transaction. The web site simply tells one woman's story about her family and recounts her view of CPC's actions and the legal events surrounding the trademark SKIPPY. Throughout most of the

_____

[1] The web site currently offers several pieces of Skippy memorabilia for sale, including posters, pins, and dolls. There is still no offer to license or sell the trademark SKIPPY for food products.

10

web site the trademark SKIPPY is used as part of editorial and historical commentary. As such it is a protected form of expression. "The freedom of speech and of the press guaranteed by the Constitution embraces at least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." Thornhill v. Alabama, 310 U.S. 88, 101-02 (1940). Before closing off such comments, the district court must articulate the state's interest and then narrowly draw an injunction to prohibit only illegal conduct and nothing more. See Madsen, 512 U.S. at 765.

III.

Because the injunction fails to comply with the requirements of Rule 65(d) and because it raises serious First Amendment concerns, we vacate the injunction and remand for further proceedings in accordance with this opinion.[2]

VACATED AND REMANDED

_____
[2] We do not find meritorious appellants' assertion that the district court erred in failing to disqualify CPC's counsel for conflict of interest.

11