**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 14-1568**

─────────────

THE RADIANCE FOUNDATION, INC.; RYAN BOMBERGER,

       Plaintiffs - Appellants,

    v.

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

       Defendant - Appellee.

------------------------------------

ELECTRONIC FRONTIER FOUNDATION; AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA; NATIONAL BLACK PRO-LIFE COALITION; WALTER B. HOYE, II; DR. ALVEDA C. KING; DR. DAY GARDNER,

       Amici Supporting Appellants.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Raymond A. Jackson, District Judge. (2:13-cv-00053-RAJ-DEM)

─────────────

Argued: March 25, 2015          Decided: May 19, 2015

─────────────

Before WILKINSON and HARRIS, Circuit Judges, and DAVIS, Senior Circuit Judge.

─────────────

Vacated and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Harris and Senior Judge Davis joined.

─────────────

**ARGUED:** Charles Manley Allen, GOODMAN, ALLEN & FILETTI, PLLC, Glen Allen, Virginia, for Appellants. Pratik A. Shah, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellee. **ON BRIEF:** William F. Demarest III, GOODMAN, ALLEN & FILETTI, PLLC, Glen Allen, Virginia, for Appellants. Anthony T. Pierce, Z.W. Julius Chen, Matthew A. Scarola, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., for Appellee. Eugene Volokh, FIRST AMENDMENT AMICUS BRIEF CLINIC, Mairead Dolan, Student, UCLA SCHOOL OF LAW, Los Angeles, California, for Amici Electronic Frontier Foundation and ACLU of Virginia. Catherine W. Short, LIFE LEGAL DEFENSE FOUNDATION, Ojai, California; Nikolas T. Nikas, Dorinda C. Bordlee, BIOETHICS DEFENSE FUND, Metairie, Louisiana, for Amici National Black Pro-Life Coalition, Walter B. Hoye II, Dr. Alveda C. King, and Dr. Day Gardner.

WILKINSON, Circuit Judge:

The Radiance Foundation published an article online entitled "NAACP: National Association for the Abortion of Colored People" that criticized the NAACP's stance on abortion. In response to a cease-and-desist letter from the NAACP, Radiance sought a declaratory judgment that it had not infringed any NAACP trademarks. The NAACP then filed counterclaims alleging trademark infringement and dilution.

The Lanham Act protects against consumer confusion about the source or sponsorship of goods or services. Persons may not misappropriate trademarks to the detriment of consumers or of the marks themselves. However, the Act's reach is not unlimited. To find Lanham Act violations under these facts risks a different form of infringement -- that of Radiance's expressive right to comment on social issues under the First Amendment. Courts have taken care to avoid Lanham Act interpretations that gratuitously court grave constitutional concerns, and we shall do so here. We hold that Radiance is not liable for trademark infringement or dilution of defendant's marks by tarnishment. We vacate the injunction against Radiance entered by the district court and remand with instructions that defendant's counterclaims likewise be dismissed.

3

The National Association for the Advancement of Colored People, better known by its acronym "NAACP," is this country's "oldest and largest civil rights organization," Radiance Found., Inc. v. NAACP, 25 F. Supp. 3d 865, 872 (E.D. Va. 2014), and one that holds a place of honor in our history. It champions "political, educational, social, and economic equality of all citizens" while working to eliminate racial and other forms of prejudice within the United States. Id. Since its formation, it has pursued these objectives not only through litigation but also through community outreach, informational services, and educational activities on issues of significance to the African American community. See id. The NAACP owns several trademarks, among them "NAACP" (federally registered) and "National Association for the Advancement of Colored People."

The Radiance Foundation, established by Ryan Bomberger, is also a non-profit organization focused on educating and influencing the public about issues impacting the African American community. Radiance addresses social issues from a Christian perspective. It uses as its platform two websites, TheRadianceFoundation.org and TooManyAborted.com, where it posts articles on topics such as race relations, diversity, fatherlessness, and the impact of abortion on the black community. Id. at 873. Radiance also runs a billboard campaign

4

for TooManyAborted.com; individuals may sponsor these billboards, licensing the artwork from Radiance. In addition to its billboard campaign, Radiance funds its endeavors through donations from visitors to its websites, which are facilitated by "Donate" buttons on the webpages that link to a PayPal site.

In January 2013, Bomberger authored an article criticizing the NAACP's annual Image Awards, entitled "NAACP: National Association for the Abortion of Colored People." See J.A. 869. The piece lambasted the NAACP for sponsoring an awards event to recognize Hollywood figures and products that Radiance alleged defied Christian values and perpetuated racist stereotypes. The article then criticized other of the NAACP's public stances and actions. It particularly targeted the NAACP's ties to Planned Parenthood and its position on abortion. Though the NAACP has often claimed to be neutral on abortion, Radiance maintains that the NAACP's actions actually demonstrate support for the practice.

The article appeared on three websites: the two owned by Radiance -- TheRadianceFoundation.com and TooManyAborted.com -- and a third-party site called LifeNews.com. Though the text of the article was identical across the sites, the headlines and presentation varied slightly. On TheRadianceFoundation.com, directly below the headline was an image of a TooManyAborted billboard with the headline "NAACP: National Association for the

5

Abortion of Colored People" repeated next to it. Id. The TooManyAborted.com site posted the headline "The National Association for the Abortion of Colored People" with a graphic below of a red box with the words "CIVIL WRONG" followed by the modified NAACP name. Id. at 899. Adjacent to the article on both pages was an orange button with "CLICK HERE TO GIVE ONE-TIME GIFT TO THE RADIANCE FOUNDATION" printed around the word "DONATE." Id. at 869, 989. Finally on LifeNews.com, the third-party site, the NAACP's Scales of Justice appeared as a graphic underneath the headline. Id. at 101.

The NAACP sent Radiance a cease-and-desist letter on January 28, 2013, after a Google alert for the "NAACP" mark unearthed the LifeNews.com article. Radiance thereupon brought a declaratory action seeking a ruling that it had not infringed or diluted any of the NAACP's marks and that its use of the marks, or similar ones, was protected under the First Amendment. The NAACP counterclaimed for trademark infringement under 15 U.S.C. §§ 1114(1) and 1125(a) and Virginia state law, and trademark dilution under 15 U.S.C. § 1125(c).

After a bench trial, the district court found for the NAACP on all counterclaims and denied declaratory relief to Radiance. It held that Radiance had used the marks "in connection with" goods and services and that its use of the "NAACP" and "National Association for the Advancement of Colored People" marks, or a

6

colorable imitation, created a likelihood of confusion among consumers. Radiance Found., 25 F. Supp. 3d at 878-79.

The district court also found that the use of the mark created a likelihood of dilution by tarnishment by associating the NAACP and its marks with a pro-abortion position. Id. at 880, 895. The court found that Radiance's actions failed to qualify as fair use, news reporting, news commentary, or noncommercial use. Radiance was accordingly deemed ineligible for those usages protected under the Lanham Act itself. Id. at 897-99.

The district court issued a permanent injunction "against any use [by Radiance] of 'National Association for the Abortion of Colored People' that creates a likelihood of confusion or dilution." Id. at 902. However, it declined to award any damages or attorney's fees, as it found the NAACP had failed to make the case that they were warranted. Id. at 899-901.

Radiance now appeals. "We review a judgment following a bench trial under a mixed standard of review -- factual findings may be reversed only if clearly erroneous, while conclusions of law, . . . are examined de novo." Roanoke Cement Co. v. Falk Corp., 413 F.3d 431, 433 (4th Cir. 2005). For the reasons given below, we must reverse. The NAACP does not have actionable claims for trademark infringement here, and Radiance's use of the NAACP's marks or colorable imitations falls squarely within

7

the exceptions to trademark dilution specifically included in the Lanham Act to avoid encroaching on free speech rights.

## II.

### A.

We must first review briefly the Lanham Act principles relevant to this action. The Lanham Act's provisions prohibiting trademark infringement, 15 U.S.C. §§ 1114(1) and 1125(a), exist to protect consumers from confusion in the marketplace. See Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 162–64 (1995). Trademarks designate the source or affiliation of goods and services in order to provide consumers with information about those goods and services, allowing mark holders to build and benefit from the reputation of their brands. Trademark infringement laws limit the ability of others to use trademarks or their colorable imitations in commerce, so that consumers may rely on the marks to make purchasing decisions. See CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 461 (4th Cir. 2000) ("The basic objectives of trademark law are to encourage product differentiation, promote the production of quality goods, and provide consumers with information about the quality of goods.").

Trademark protection, however, comes at a potential cost to free expression. Much like advertising regulations that prohibit using false or misleading information, trademark infringement

8

laws restrict speech in order to promote the government's interest in protecting consumers from confusing misappropriations of product identifications. However, Congress "did not intend for trademark laws to impinge the First Amendment rights of critics and commentators." Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005). The Lanham Act and First Amendment may be in tension at times, but they are not in conflict so long as the Act hews faithfully to the purposes for which it was enacted. Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 900 (9th Cir. 2002). The risk of impinging on protected speech is much greater when trademarks serve not to identify goods but rather to obstruct the conveyance of ideas, criticism, comparison, and social commentary. The canon of constitutional avoidance in this area is thus not a device of judicial evasion but an effort to reconcile the commercial values protected by the Lanham Act and the democratic value of expressive freedom. See Rogers v. Grimaldi, 875 F.2d 994, 998 (2d Cir. 1989); cf. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988).

It is for this reason that an actionable trademark claim does not simply require that the alleged infringer used in commerce the mark that the trademark holder possesses. It also requires that the infringer's use be "in connection with" goods or services in a manner that is "likely to cause confusion"

9

among consumers as to the goods' or services' source or sponsorship. 15 U.S.C. §§ 1114(1)(a) & 1125(a)(1); see People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 366 (4th Cir. 2001) ("PETA"); United We Stand Am., Inc. v. United We Stand, Am. New York, Inc., 128 F.3d 86, 91-92 (2d Cir. 1997) ("It poked fun at the plaintiff, but did not cause consumer confusion as to source or origin." (emphasis added)). Use of a mark that does not satisfy these two criteria is not trademark infringement. Lamparello, 420 F.3d at 313-14.

B.

The first element of trademark infringement at issue is thus whether Radiance's use of the NAACP's marks was "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a); see also id. § 1125(a)(1) (requiring mark be used "in connection with any goods or services"). The NAACP urges us to give this requirement a "broad construction," Appellee's Br. at 18, but that construction would expose to liability a wide array of noncommercial expressive and charitable activities. Such an interpretation would push the Lanham Act close against a First Amendment wall, which is incompatible with the statute's purpose and stretches the text beyond its breaking point. We decline to reach so far.

10

At least five of our sister circuits have interpreted this element as protecting from liability all noncommercial uses of marks. Farah v. Esquire Magazine, 736 F.3d 528, 541 (D.C. Cir. 2013); Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d 1045, 1052-54 (10th Cir. 2008); Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 676-77 (9th Cir. 2005); Taubman Co. v. Webfeats, 319 F.3d 770, 774 (6th Cir. 2003); Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120 (8th Cir. 1999). But see United We Stand, 128 F.3d at 89-90. We have not taken a position on whether "in connection with" goods or services indicates a commercial use. Lamparello, 420 F.3d at 313-14.

At the very least, reading the "in connection with" element to take in broad swaths of noncommercial speech would be an "overextension" of the Lanham Act's reach that would "intrude on First Amendment values." Rogers, 875 F.2d at 998; see also Taubman, 319 F.3d at 774 (stating that the "Lanham Act is constitutional because it only regulates commercial speech"). It is true that neither of the Lanham Act's infringement provisions explicitly mentions commerciality. Lamparello, 420 F.3d at 314. Still, this provision must mean something more than that the mark is being used in commerce in the constitutional sense, because the infringement provisions in § 1114(1)(a) and § 1125(a)(1) include a separate Commerce Clause hook. Bosley, 403

11

F.3d at 677; Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d 359, 363-64 (4th Cir. 2003); United We Stand, 128 F.3d at 92-93.

Although this case does not require us to hold that the commercial speech doctrine is in all respects synonymous with the "in connection with" element, we think that doctrine provides much the best guidance in applying the Act. The "in connection with" element in fact reads very much like a description of different types of commercial actions: "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a) (emphasis added).

Use of a protected mark as part of "speech that does no more than propose a commercial transaction" thus plainly falls within the Lanham Act's reach. United States v. United Foods, Inc., 533 U.S. 405, 409 (2001). Courts also look to the factors outlined in Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 66-67 (1983): whether the speech is an advertisement; whether the speech references a particular good or service; and whether the speaker (the alleged infringer) has a demonstrated economic motivation for his speech. Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 285 (4th Cir. 2013) (en banc). These are not exclusive factors, and the

12

presence or absence of any of them does not necessitate a particular result.

In the context of trademark infringement, the Act's purpose, as noted, is to protect consumers from misleading uses of marks by competitors. Thus if in the context of a sale, distribution, or advertisement, a mark is used as a source identifier, we can confidently state that the use is "in connection with" the activity. Even the Second Circuit, which rejected noncommerciality as an invariable defense to Lanham Act liability, conceded that a "crucial" factor is that the infringer "us[ed] the Mark not as a commentary on its owner, but instead as a source identifier." United We Stand, 128 F.3d at 92. The danger of allowing the "in connection with" element to suck in speech on political and social issues through some strained or tangential association with a commercial or transactional activity should thus be evident. Courts have uniformly understood that imposing liability under the Lanham Act for such speech is rife with the First Amendment problems.

Finally, in order to determine whether the use is "in connection with" goods or services, we must consider what qualifies as a good or service. The Lanham Act does not directly define either term, but we can deduce their meaning from other defined terms and common usage. A "good" is best understood as a valuable product, physical or otherwise, that the consumer may

13

herself employ. See 15 U.S.C. § 1127 (noting that a mark may be used in commerce in relation to a good when placed on a good, its container, its tag, or its associated documents); Black's Law Dictionary 809 (10th ed. 2014) (defining "goods" as "[t]hings that have value, whether tangible or not"). A service is a more amorphous concept, "denot[ing] an intangible commodity in the form of human effort, such as labor, skill, or advice." Black's Law Dictionary 1576. Because Congress intended the Lanham Act to protect consumers from confusion in the marketplace, it is probable that the Act is meant to cover a wide range of products, whether "goods" or "services." See Yates v. United States, 135 S. Ct. 1074, 1082 (2015) ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.").

It is clear, therefore, that despite the need to reconcile the reach of the Lanham Act with First Amendment values, "goods or services" remains a broad and potentially fuzzy concept. That is yet another reason why the "in connection with" language must denote a real nexus with goods or services if the Act is not to fatally collide with First Amendment principles.

## C.

The second element in establishing Lanham Act liability is whether the use of the trademark is "likely to cause confusion"

14

among consumers regarding the source or sponsorship of the goods or services. 15 U.S.C. §§ 1114(1)(a) & 1125(a)(1)(A). Here it is important to remember that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991) (quotation marks omitted); see also Bosley, 403 F.3d at 677. That is because a trademark "only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his." Prestonettes, Inc. v. Coty, 264 U.S. 359, 368 (1924) (emphasis added).

This court and others have employed any number of frameworks to assess the likelihood of confusion, generally balancing a slew of relevant factors. See, e.g., Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984). This court considers "the strength of the [trademark holder's] mark, the degree of similarity between the two marks, the similarity of the goods they identify, the similarity of the facilities used in the businesses, the similarity of the advertising, the [infringer's] intent, and the presence of actual confusion," Anheuser-Busch, Inc. v. L. & L. Wings, Inc., 962 F.2d 316, 320 (4th Cir. 1992), as well as the "quality of the [infringer's] product," and the "sophistication of the consuming public," George & Co., LLC v. Imagination Entm't Ltd., 575 F.3d 383, 393

15

(4th Cir. 2009). These factors are not a "rigid formula" but rather "only a guide," Anheuser-Busch, 962 F.2d at 320, and each factor may be more or less relevant or important for any given case, Lamparello, 420 F.3d at 314-15.

In conducting such an inquiry, which is inherently fact-bound and context dependent, we must bear in mind the purpose behind it -- preventing consumer confusion of the infringer's goods or services with those of the trademark holder's. When the infringer's intent is something other than piggybacking off a mark holder's success by tricking consumers into purchasing his goods instead, the other factors must be evaluated in light of that intent and purpose. See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 261 (4th Cir. 2007) ("An intent to parody is not an intent to confuse the public." (quotations marks omitted)). Although finding an alternative intent does not prevent us from applying the factors, it does "influence[] the way in which [they] are applied." Id.

Marks used to parody, satirize, criticize, comment, or compare make "the multi-factored inquiry under Pizzeria Uno . . . at best awkward" and require that the use be assessed in that context. Anheuser-Busch, 962 F.2d at 321 (quotation marks omitted). For example, the strength of the mark and the similarity between the marks often work in reverse for cases of parody and satire as compared to a standard infringement case.

16

Louis Vuitton, 507 F.3d at 261. "The keystone of parody is imitation," Anheuser-Busch, 962 F.2d at 321, and the similarity -- with key differences -- between the original mark and the parody may only enhance the effect of the latter and the "strong mark's fame and popularity [are] precisely the mechanism[s] by which likelihood of confusion is avoided," Louis Vuitton, 507 F.3d at 261.

As with the "in connection with" element, the "likelihood of confusion" test, if misapplied, can implicate free speech concerns. When the "use of the trademark does not imply sponsorship or endorsement of the product because the mark is used only to describe the thing, rather than to identify its source," restricting speech does not serve the purpose of the Lanham Act. New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 306-08 (9th Cir. 1992). Indeed, criticism or parody of a mark holder would be difficult indeed without using the mark. Id. Trademark protections exist neither to allow companies to protect themselves from criticism nor to permit them to "control language." Skippy, 214 F.3d at 462 (quoting Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1710-11 (1999)). Even some amount of "actual confusion" must still be weighed against the interest in a less fettered marketplace of social issues speech. See Rogers, 875 F.2d at 1001.

III.

In applying the above principles, we think the district court made several errors. Those mistakes extended the Lanham Act beyond the purposes it was intended to serve.

A.

In finding that Radiance's use of the NAACP's marks was "in connection with" goods or services, the district court erred in several respects. To begin, the court held that because the Radiance article appeared in a Google search for the term "NAACP," it diverted "Internet users to Radiance's article as opposed to the NAACP's websites," which thereby created a connection to the NAACP's goods and services. Radiance Found., Inc. v. NAACP, 25 F. Supp. 3d 865, 884 (E.D. Va. 2014). But typically the use of the mark has to be in connection with the infringer's goods or services, not the trademark holder's. See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research, 527 F.3d 1045, 1053-54 (10th Cir. 2008) (stating that "the defendant in a trademark infringement . . . case must use the mark in connection with the goods or services of a competing producer, not merely to make a comment on the trademark owner's goods or services").

If the general rule was that the use of the mark merely had to be in connection with the trademark holder's goods or services, then even the most offhand mention of a trademark

18

holder's mark could potentially satisfy the "in connection with" requirement. That interpretation would expand the requirement to the point that it would equal or surpass the scope of the Lanham Act's "in commerce" jurisdictional element. This would not only make the jurisdictional element superfluous, but would hamper the ability of the "in connection with" requirement to hold Lanham Act infractions within First Amendment limits.

In People for the Ethical Treatment of Animals v. Doughney, we stated that an infringer "need only have prevented users from obtaining or using [the trademark holder's] goods or services, or need only have connected the [infringing] website to other's goods or services" in order to satisfy the "in connection with" requirement. 263 F.3d 359, 365 (4th Cir. 2001). But that rule applies specifically where the infringer has used the trademark holder's mark in a domain name. Id. at 365-66. Neither of Radiance's websites used an NAACP mark in its domain name. Rather, Radiance used the NAACP's marks only in the title and body of an article criticizing the NAACP. Nothing in PETA indicates that the use of a mark in the course of disseminating such an idea is on that account sufficient to establish the requisite relationship to goods or services. PETA simply does not govern the application of the "in connection with" element in this case.

The district court proceeded to find that Radiance's use of the NAACP's marks was also in connection with Radiance's goods or services. Radiance Found., 25 F. Supp. 3d at 884-85. But the court's analysis failed to demonstrate a sufficient nexus between the specific use of the marks and the sale, offer for sale, distribution, or advertisement of any of the goods or services that the court invoked. The court first found that there was a sufficient nexus "with Radiance's own information services" because Radiance "provided information" on its website. Id. at 884. That ruling, however, neuters the First Amendment. The provision of mere "information services" without any commercial or transactional component is speech -- nothing more.

In the alternative, the court held that Radiance's use of the NAACP's marks was in connection with goods or services, because the use was "part of social commentary or criticism for which they solicit donations and sponsorship." Id. The NAACP echoes the district court, arguing that the transactional nature of the billboard campaign and Radiance's fundraising efforts place Radiance's use of the marks "comfortably within" the reach of the "in connection with" element. Appellee's Br. at 24-26.

We need not address this point with absolute pronouncements. Suffice it to say that the specific use of the marks at issue here was too attenuated from the donation

20

solicitation and the billboard campaign to support Lanham Act liability. Although present on the article page, the Donate button was off to the side and did not itself use the NAACP's marks in any way. The billboard campaign was displayed on a different page altogether. A visitor likely would not perceive the use of the NAACP's marks in the article as being in connection with those transactional components of the website. It is important not to lose perspective. The article was just one piece of each Radiance website's content, which was comprised of articles, videos, and multimedia advocacy materials. That the protected marks appear somewhere in the content of a website that includes transactional components is not alone enough to satisfy the "in connection with" element. To say it was would come too close to an absolute rule that any social issues commentary with any transactional component in the neighborhood enhanced the commentator's risk of Lanham Act liability.

The Supreme Court has warned "that charitable appeals for funds . . . involve a variety of speech interests . . . that are within the protection of the First Amendment." Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980). Such solicitation, the Court stated, is not a "variety of purely commercial speech." Id. Courts are thus well-advised to tread cautiously when a trademark holder invokes the Lanham

21

Act against an alleged non-profit infringer whose use of the trademark holder's marks may be only tenuously related to requests for money. Again, this is not to say that in all instances a solicitation by a non-profit is immune from Lanham Act liability. A solicitation may satisfy the "in connection with" element if the trademark holder demonstrates a sufficient nexus between the unauthorized use of the protected mark and clear transactional activity. Such a nexus may be present, for example, where the protected mark seems to denote the recipient of the donation. However, where, as here, the solicitations are not closely related to the specific uses of the protected marks, we are compelled to conclude that the district court erred in ruling that the "in connection element" was met.

B.

The district court likewise considered the likelihood of confusion from Radiance's use of the marks. First and foremost, it based its finding in great part on whether consumers thought "NAACP" in fact stood for "National Association for the Abortion of Colored People." Radiance Found., 25 F. Supp. 3d at 887-89 (relying on survey evidence). Trademark infringement provisions do not protect against confusion about the marks themselves because marks are not goods or services but instruments to identify goods and services. Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 263 (4th Cir. 2007) ("The

22

misspellings pointed out by LVM [in the Vuitton name] are far more likely in this context to indicate confusion over how to spell the product name than any confusion over the source or sponsorship of the 'Chewy Vuiton' dog toys."). Thus confusion about what a particular trademark says or looks like is not relevant for infringement claims. We may certainly account for similarities between the trademark holder's and infringer's marks in the likelihood of confusion analysis, but only in the context of how those similarities create confusion about the source of any products the marks identify.

Likewise, trademark infringement is not designed to protect mark holders from consumer confusion about their positions on political or social issues. The evidence of "actual confusion" relied on by the district court consisted of phone calls to the NAACP by people who took issue with the NAACP supporting abortion. Radiance Found., 25 F. Supp. 3d at 888-89. "[I]ndignation is not confusion," Girl Scouts of U.S. v. Personality Posters, Mfg. Co., 304 F. Supp. 1228, 1231 (S.D.N.Y. 1969), at least not as pertains to trademark infringement, and at best the calls demonstrated confusion as to the NAACP's policy positions rather than any good or service. Policy stances are neither goods nor services, though the means of conveying them may be.

23

Political discourse is the grist of the mill in the marketplace of ideas. It may be that the only -- but also the best -- remedy available to a trademark holder is to engage in responsive speech. For even where a speaker lies, "more accurate information will normally counteract the lie." United States v. Alvarez, 132 S. Ct. 2537, 2556 (2012) (Breyer, J., concurring in the judgment). The NAACP is a renowned civil rights organization with numerous mechanisms for connecting with its membership and the public. Organizations of its size and stature possess megaphones all their own. "Actual confusion" as to a non-profit's mission, tenets, and beliefs is commonplace, but that does not transform the Lanham Act into an instrument for chilling or silencing the speech of those who disagree with or misunderstand a mark holder's positions or views. See Rogers v. Grimaldi, 875 F.2d 994, 1001 (2d Cir. 1989).

The district court also concluded that some consumers might be confused about an affiliation between the authors of the article and the NAACP. Radiance Found., 25 F. Supp. 3d at 889. But it is not immediately apparent how someone would confuse an article which is strongly critical of an organization with the organization itself. The mark in this case was used primarily to identify the NAACP as the object of Radiance's criticism, resembling a descriptive or nominative fair use albeit by employing a modified version of the name. Admittedly, the

24

attention span on the Internet may not be long, but the briefest familiarity with the article would quickly create the impression the author was no friend of the NAACP. Indeed, in just the first two lines, the piece refers to the NAACP as an "out-of-touch liberal organization" and accuses its Image Awards of honoring "black imagery churned out by often racist, anti-Christian, perpetually sexist, violent and pornographic Hollywood." J.A. 869. Intemperate and worse as the commentary is, holding it actionable risks creating the paradox that criticism equals confusion, thereby permitting companies to shield themselves from adverse assessments. Indeed, "'[m]uch useful social and commercial discourse would be all but impossible if speakers were under threat of an infringement lawsuit every time they made reference to a person, company or product by using its trademark.'" CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 462 (4th Cir. 2000) (quoting New Kids on the Block v. News Am. Publ'g, Inc., 971 F.2d 302, 307 (9th Cir. 1992)).

It remains essential in any analysis of confusion to consider fully the purpose with which the mark was being used. The trial court did entertain the possibility of parody, but once it found that Radiance had not engaged in a successful parody, it ended its inquiry there. Radiance Found., 25 F. Supp. 3d at 891-93. If not quite parody, the use of "National Association for the Abortion of Colored People" in this context

25

may be more akin to satire, which "works by distort[ing] . . . the familiar with the pretense of reality in order to convey an underlying critical message." Farah v. Esquire Magazine, 736 F.3d 528, 537 (D.C. Cir. 2013) (quotation marks omitted). Whatever the label affixed to the article, Radiance's twist on the famous moniker follows in the same vein as articles that refer to the NRA as the "National Republican Association" or the ACLU as the "Anti-Christian Lawyers Union." Amicus Br. of Elec. Frontier Found. & ACLU of Va. at 3-4, 6-7. Biting, surely; distortive, certainly; Radiance's ploy was nonetheless effective at conveying sharply what it was that Radiance wished to say. The implications for the likelihood of confusion factors are thus obvious: parody or satire or critical opinion generally may be more effective if the mark is strong and the satirical or critical version is similar to the original. The critical message conveyed by the satirical mark itself and in the commentary that follows ensures that no confusion about the source of the commentary will last, if in fact it is generated at all.

It is important moreover to pay sufficient attention to the full context in which the mark was used, which diminishes the likelihood of confusion about source even further. The domain names and webpage headings clearly denote other organizations: The Radiance Foundation or TooManyAborted. For each site, this

post was one of dozens of articles on social and political issues.

Suppose, however, a viewer caught no more than the title of the article: "NAACP: National Association for the Abortion of Colored People." The claim against Radiance would still not lie. Titles, as part of expressive works, "require[] more protection than the labeling of ordinary" goods. Rogers, 875 F.2d at 998. For consumers understand and expect titles to pertain to the contents of the underlying work rather than authorship or the publisher. See Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 902 (9th Cir. 2002); Rogers, 875 F.2d at 999-1000. Provided the title is connected to and not misleading about the contents and does not use the mark in a way that clearly suggests authorship, see Rogers, 875 F.2d at 999, use of a mark in a title will generally not result in the type of consumer confusion necessary to support infringement claims. In this case, the title related to and conveyed the subject of the article: the NAACP and Radiance's views of its alleged stance on abortion. The use of the satirical modification of the true NAACP name was designed, as many titles are, to be eye-catching and provocative in a manner that induces the reader to continue on. We cannot find that use of the NAACP marks in the title of the Radiance article created a likelihood of confusion as to the piece's authorship or affiliation.

27

We have identified individual difficulties with appellee's position, but it is well to understand the matter in its totality. The trial court found that using marks in a highly critical article that lambasts the NAACP for its views and actions constituted trademark infringement because the site solicits financial support for its activities, albeit attenuated from the use of the mark, and some consumers may be confused about the NAACP's true name and political positions. We need not go so far as to say that social commentary solicitations can never be the subject of a valid infringement claim in order to conclude that it will not be infringing so long as the use of the mark does not create confusion as to source, sponsorship, or affiliation. Any other holding would severely restrict all kinds of speakers from criticizing all manner of corporate positions and activities and propel the Lanham Act into treacherous constitutional terrain.

IV.

The district court further held that Radiance diluted the "NAACP" and "National Association for the Advancement of Colored People" trademarks by tarnishing them in violation of 15 U.S.C. § 1125(c). Radiance Found., Inc. v. NAACP, 25 F. Supp. 3d 865, 899 (E.D. Va. 2014). We respectfully disagree. Radiance's use of the marks was undeniably to criticize the NAACP's perceived

28

position on abortion, thus falling squarely within the statute's explicit exclusions. See 15 U.S.C. § 1125(c)(3).

A.

Whereas the law of trademark infringement is "motivated by an interest in protecting consumers" from confusion as to a product's source, the law of dilution defends the trademark itself. Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 429 (2003); see also Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1012 (9th Cir. 2004) ("The point of dilution law is to protect the owner's investment in his mark."). Specifically, the law allows "the owner of a famous mark that is distinctive" to seek an injunction where another person's use of a mark "is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." Id. § 1125(c)(2)(B). By contrast, dilution by tarnishment -- the theory at issue here -- is an association "that harms the reputation of the famous mark." Id. § 1125(c)(2)(C).

To state a prima facie claim of dilution by tarnishment, therefore, the NAACP must satisfy four elements:

29

> (1) that [it] owns a famous mark that is distinctive;
>
> (2) that [Radiance] has commenced using a mark in commerce that allegedly is diluting the famous mark;
>
> (3) that a similarity between [the diluter's] mark and the famous mark gives rise to an association between the marks; and
>
> (4) that the association is likely . . . to harm the reputation of the famous mark.

Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 168 (4th Cir. 2012) (quoting Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC, 507 F.3d 252, 264-65 (4th Cir. 2007)).

The first three elements are met here: the marks Radiance used in commerce were either identical or highly similar to the NAACP's undoubtedly famous marks. As for the fourth element, harming a famous mark's reputation means "creat[ing] consumer aversion to the famous brand." Rosetta Stone, 676 F.3d at 167. Such aversion may be shown when the famous mark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context." Id. (quoting Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 489 (5th Cir. 2004)); see also Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 111 (2d Cir. 2010). Radiance has not challenged the district court's finding that the article was likely to harm the NAACP's marks. Indeed, the whole point of the article was to criticize the NAACP, and Radiance attempted to accomplish that goal in part by playing

30

off the NAACP's name. The NAACP thus established a prima facie case of dilution by tarnishment.

B.

However, that does not end the inquiry. The law provides three broad, overlapping categories within which any use of a famous mark, even if likely to cause harm or blurring, is not actionable: fair use; news reporting and news commentary; and noncommercial use. 15 U.S.C. § 1125(c)(3). Radiance asserts that its use of the NAACP's marks qualifies for protection under these affirmative defenses. Because we hold that Radiance's speech falls plainly within the fair and noncommercial use exclusions, we have no need to address Radiance's "news reporting and news commentary" defense.

The first exclusion covers "[a]ny fair use, including a nominative or descriptive fair use," and "including use in connection with," among other things, "identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner." Id. § 1125(c)(3)(A)(ii) (emphasis added). A descriptive fair use "applies when the [dilution] defendant is using a trademark in its primary, descriptive sense to describe the defendant's goods or services," whereas "nominative fair use comes into play when the defendant uses the famous mark to identify or compare the trademark owner's product." Rosetta Stone, 676 F.3d at 169

31

(quotation marks omitted). No use may be "a designation of source for the [user's] own goods or services." 15 U.S.C. § 1125(c)(3)(A). That is, the fair use exclusion does not provide a safe harbor for one who uses another's famous mark as a trademark. See Louis Vuitton, 507 F.3d at 266. Finally, good faith is a "common component" of fair use analysis. Rosetta Stone, 676 F.3d at 169-70.

The NAACP, as the district court recognized, is an advocacy organization. See Radiance Found., 25 F. Supp. 3d at 872. As such, it takes positions on public issues on behalf of its stated mission; the organization exists in part to be for things. The Radiance article used the NAACP's marks to comment upon what it sees as the policies the NAACP supports or does not support, as the case may be. Within the context of the article, the use of the NAACP's famous marks unquestionably framed and referenced the NAACP's policy positions, or at least Radiance's view of what those positions are. The article repeatedly referred to the NAACP's purported support for abortion and Planned Parenthood, using sexual and other graphic metaphors to hammer the point home. Even if we were to take the title out of context and view it separately from the rest of the article, the use was still nominative, because it explicitly referred to what

32

the author believes the NAACP stands for: the abortion of African American children.[*]

The district court also reiterated its belief that referring to the NAACP as the "National Association for the Abortion of Colored People" is not a parody. Id. at 897. The fair use defense, however, is not limited to parody; it also embraces uses that "criticiz[e]" or "comment[] upon" the NAACP or its services. 15 U.S.C. § 1125(c)(3)(A)(ii). Regardless of whether Radiance's use of the NAACP's marks legally qualifies as parody, it is abundantly clear that Radiance used "NAACP" in conjunction with "National Association for the Abortion of Colored People" to comment upon and criticize the NAACP for its perceived position on abortion and other issues affecting the African American community. "The National Association for the Abortion of Colored People has no moral ground to stand upon," the article goes, "just quick sand oozing with the blood of those most discriminated against. The NAACP's covert and overt support of Planned Parenthood negates any other human rights they purport to defend." J.A. 870. It is difficult to imagine what the article is if not criticism. We cannot say, and the

---

[*] Radiance does not assert that the use was descriptive fair use, nor did the district court comment upon a descriptive theory. We thus do not consider any argument that the use here was descriptive and fair.

33

district court erred in holding, that Radiance's use of the NAACP's famous marks was not a fair use.

C.

The final exclusion protects "[a]ny noncommercial use of a mark." 15 U.S.C. § 1125(c)(3)(C). The term "noncommercial" refers to the First Amendment commercial speech doctrine. Lamparello v. Falwell, 420 F.3d 309, 313 (4th Cir. 2005). Commercial speech is "'speech that does no more than propose a commercial transaction.'" Harris v. Quinn, 134 S. Ct. 2618, 2639 (2014) (quoting United States v. United Foods, Inc., 533 U.S. 405, 409 (2001)); see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 284 (4th Cir. 2013) (en banc). In determining whether speech is commercial, we consider several factors: (1) whether the speech is an advertisement; (2) whether speech refers to specific products or services; (3) whether the speaker has an economic motivation for the speech; and (4)"the viewpoint of the listener," i.e. whether the listener would perceive the speech as proposing a transaction. Greater Balt., 721 F.3d at 285-86. The factors are cumulative, but, again, the absence of any particular element does not necessarily render the speech noncommercial. Id.

The district court held that because Radiance "offered various opportunities for visitors . . . to donate to Radiance, pay to sponsor billboards, secure license content, or erect

34

state-specific webpages for a fee," the use of the NAACP's marks was commercial. Radiance Found., 25 F. Supp. 3d at 899. We think however, that the above factors mitigate against a finding of commerciality. The article in contention was not an advertisement. Nowhere in the piece did it offer the reader anything for sale. The article did not even mention Radiance's services. The only point "Radiance" even appeared in the article was as part of a passing reference to conservatives that the NAACP purportedly targets. The fact that the websites provided opportunities to engage in financial transactions does not demonstrate that the article itself was commercial. The key here is the viewpoint of a reasonable reader. A person navigating to the article, even if through a Google search for "NAACP," is highly unlikely to read the article as advertising a Radiance service or proposing a transaction of any kind.

Trademark law in general and dilution in particular are not proper vehicles for combatting speech with which one does not agree. Trademarks do not give their holders under the rubric of dilution the rights to stymie criticism. Criticism of large and powerful entities in particular is vital to the democratic function. Under appellee's view, many social commentators and websites would find themselves victims of litigation aimed at silencing or altering their message, because, as noted, "it is often virtually impossible to refer to a particular product for

35

purposes of comparison, criticism, point of reference or any other such purpose without using the mark." <u>New Kids on the Block v. News Am. Publ'g, Inc.</u>, 971 F.2d 302, 306 (9th Cir. 1992). The article in this case was harsh. But that did not forfeit its author's First Amendment liberties. The most scathing speech and the most disputable commentary are also the ones most likely to draw their intended targets' ire and thereby attract Lanham Act litigation. It is for this reason that law does not leave such speech without protection.

V.

In sum, and for the aforementioned reasons, the plaintiff's expression in no way infringed upon or diluted defendant's trademark rights. We hereby vacate the district court's injunction and remand with directions that the defendant's Lanham Act counterclaims be dismissed.

<u>VACATED AND REMANDED</u>